IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| WILLIAM D. CAVE and PAMELA L. SMITH, on behalf of themselves and all others similarly situated | : : : : | CIVIL ACTION |
| v. | : : | |
| SAXON MORTGAGE SERVICES, INC. and OCWEN LOAN SERVICING, LLC | : : | NO. 12-5366 |

## MEMORANDUM

Padova, J.                                                                                            May 9, 2013

In this putative class action, Plaintiffs assert breach of contract and other claims against

Defendants Saxon Mortgage Services, Inc. ("Saxon") and Ocwen Loan Servicing, LLC

("Ocwen") based on Defendants' failure to permanently modify home mortgage loans after

providing homeowners with temporary modifications.  Presently before the Court is Saxon's

Motion to Dismiss.  For the reasons that follow, we deny the Motion.

## I.       FACTUAL AND PROCEDURAL BACKGROUND

### A.       The Home Affordable Modification Program

The Complaint alleges the following facts.  In February 2009, the Secretary of the

Treasury and the Director of the Federal Housing Finance Agency announced the Making Home

Affordable ("MHA") program in an effort to stem the foreclosure crisis.  (Compl. ¶ 16.)  As a

part of the MHA, the Home Affordable Modification Program ("HAMP") was created.  (Id.)

Under HAMP, mortgagors can apply to their loan servicer for a permanent loan modification to

get a reduced monthly payment.  (Id. ¶ 1.)  Saxon and Ocwen are loan servicers who entered into

agreements with the federal government in which they agreed to comply with HAMP and

provide qualifying borrowers with permanent modifications.  (Id. ¶¶ 10, 11, 28-30, 37.)

After a borrower applies for a permanent modification, loan servicers are required under HAMP regulations to determine, based on all financial information submitted by the borrower, whether the borrower is eligible for a loan modification which would reduce the borrower's monthly loan payment to 31% of his gross monthly income.[1]  (Id. ¶ 32.)  Before a borrower receives a permanent modification, a loan servicer and a borrower enter into a three-month trial period, during which the borrower makes lower monthly payments towards his mortgage.  (Id. ¶ 1.)  The terms of the trial period are governed by a form contract entitled "HAMP TPP" (the "TPP").  (Id. ¶¶ 48-49; id. Exs. A, C (TPP).)  The TPP states that the lender will send the borrower a permanent modification agreement if: (1) the borrower's representations about his financial state continue to be true, and (2) the borrower complies with the terms of the temporary payment plan.  (TPP § 3.)  The TPP requires the borrower to make three monthly payments in a reduced amount.  (Compl. ¶ 48; TPP § 2.)  The TPP also states that the loan servicer will provide the borrower with a permanent modification if he is qualified, or will send the borrower a written denial if he does not qualify.  (Compl. ¶ 50; TPP Introduction.)

The Complaint alleges that despite Defendants' participation in the HAMP program, they never intended to provide permanent loan modifications to the majority of applicants.  (Compl. ¶

---

[1]Specifically, HAMP requires Defendants to take a specific set of steps, called a "waterfall," to determine if they can offer a target monthly payment of 31% of income.  (Id. ¶ 32.)  These steps include capitalizing accrued interest and escrow advances, reducing the interest rate, extending the term of and amortizing the loan, and providing a principal forbearance.  (Id.)  If the application of these steps produces terms that yield the target monthly payment, Defendants must perform the Net Present Value test to determine whether the value of performing a loan modification exceeds the value of foreclosing on the property.  (Id. ¶ 33.)  If the modification is more valuable, Defendants must offer a temporary modification to the borrower.  (Id.)  If the modification would be less valuable, mortgage servicers must send a "Non-Approval Notice" to the borrower and consider the borrower for other foreclosure prevention options.  (Id. ¶ 38.)  HAMP regulations require that Defendants prequalify borrowers for a permanent modification before entering into a trial period contract.  (Id. ¶ 34.)

47.) Rather, Defendants routinely failed to meet their obligations under HAMP, by, *inter alia*, thwarting implementation of permanent HAMP modifications, keeping inadequate records, failing to disclose accurate information to mortgagors, charging unreasonable fees without explanation, violating federal and state laws, and "leaving mortgagors in limbo regarding the status of their loans." (Id. ¶ 40.) Since HAMP's inception through November 2010, loan servicers participating in HAMP cancelled roughly 729,000 of the 1.4 million trial modifications offered. (Id. ¶ 18.)

B.     Plaintiffs' Temporary Loan Modification Contracts

1.     William D. Cave

Plaintiff William D. Cave applied to Saxon in August 2009 for a HAMP mortgage modification, after suffering financial hardship and experiencing difficulty in paying his mortgage. (Id. ¶ 54.) Cave provided Saxon with all requested financial information in support of his application. (Id.) Saxon notified Cave that he had been approved for a TPP, and sent him a written copy of the TPP on September 16, 2009. (Id. ¶ 55.) Cave promptly signed and returned the TPP to Saxon, along with his modified payment. (Id. ¶ 56.) Saxon signed the TPP on October 5, 2009, and returned it to Cave. (Id. ¶ 57.)

Cave fully performed all of his obligations under the TPP, including making all reduced monthly payments on time and providing copies of all financial documents requested by Saxon, including a Hardship Affidavit. (Id. ¶ 60.) Despite Cave's full performance under the TPP, Saxon failed to provide him with a permanent Home Affordable Agreement on the terms promised in the TPP, and also failed to provide him with a timely written denial letter explaining its basis for denying him a permanent modification. (Id. ¶ 61.) In February and May 2010, Saxon charged Cave's escrow account in the amounts of $276.00 and $821.00 for fire insurance

that Cave's homeowner's insurance policy already provided, and also charged his escrow account in the amount of $2,632.22 for payment of school taxes, even though Cave had already paid that tax bill.  (Id. ¶ 65.)

By letter dated April 1, 2010, Cave was advised that Saxon was transferring the servicing of his mortgage to Ocwen, effective April 16, 2010.  (Id. ¶ 66.)  Ocwen informed Cave that he would need to apply for another HAMP modification, and if he did not qualify under HAMP, he would be considered for an in-house modification.  (Id. ¶ 67.)  Cave applied to Ocwen for a HAMP modification, which Ocwen denied.  (Id.)  Ocwen informed Cave that the owner of his loan "does not allow loan modifications or is not participating in the HAMP program."  (Id.)

2.    Pamela L. Smith

Plaintiff Pamela L. Smith applied to Saxon in the spring of 2009 for a HAMP mortgage modification, after suffering financial hardship and experiencing difficulty in paying her mortgage.  (Id. ¶ 69.)  Smith was advised by a Saxon representative that nothing could be done for her unless she was in default, and that she should therefore stop making her regular monthly payments.  (Id. ¶ 70.)  After applying to Saxon for a HAMP modification, Smith sent Saxon a package containing all requested financial information, including a Hardship Affidavit.  (Id. ¶ 71.)  Saxon approved her for a temporary modification and sent her a written copy of the TPP on June 29, 2009.  (Id. ¶ 72.)  Smith promptly signed and returned the TPP to Saxon, along with her modified monthly payment.  (Id. ¶ 73.)  Saxon signed the TPP on August 18, 2009, and returned it to Smith.  (Id. ¶ 74.)

Smith fully performed all of her obligations under the TPP, including making all reduced monthly payments on time and providing copies of all financial documents requested by Saxon.  (Id. ¶ 77.)  Despite her full performance under the TPP, Saxon failed to provide Smith with a

permanent Home Affordable Agreement on the terms promised in the TPP, and also failed to provide a timely written denial letter explaining its basis for denying her a permanent modification. (Id. ¶¶ 78-79.) Instead, Saxon charged unreasonable fees to her mortgage and twice informed Smith of its intent to foreclosure on her property. (Id. ¶ 81.) In February 2011, Plaintiff reapplied to Saxon for a HAMP modification, and also sought assistance through a nonprofit organization to apply to Pennsylvania's Homeowners Emergency Mortgage Assistance Program ("HEMAP"). (Id. ¶ 82.) Saxon failed to cooperate or assist Smith in obtaining a HEMAP loan, and Plaintiff never received the assistance that she sought. (Id.)

By letter dated April 13, 2011, Smith was advised that Saxon was transferring the servicing of her mortgage to Ocwen, effective May 2, 2011. (Id. ¶ 83.) Smith applied to Ocwen for a HAMP modification, which Ocwen denied. (Id. ¶ 84.) Smith was informed that her modification was denied because Ocwen was "unable to create an affordable payment equal to 31% of [Smith's] reported monthly gross income without changing the terms of [her] loan beyond the requirements of the program." (Id.)

C.     Class Allegations

Plaintiffs bring this action pursuant to Federal Rules of Civil Procedure 23(a), (b)(2), and (b)(3), on behalf of themselves and a Class consisting of all Pennsylvania homeowners whose loans were serviced by Defendants and who, since April 13, 2009, entered into a TPP, made all payments as required, complied with requests for documentation, and:

> (1) Did not receive a permanent modification and did not receive a timely written notification explaining the reason for the denial of the modification (the "Denied Class") (Id. ¶ 86.a);
>
> (2) Were improperly reported to credit reporting agencies as delinquent during the trial payment period (the "Credit Reporting Class") (Id. ¶ 86.b); or

(3) Were improperly placed in foreclosure and/or charged for various foreclosure-related fees (the "Foreclosure Class.") (Id. ¶ 86.c.)

The Complaint asserts claims for Breach of Contract and Breach of the Duty of Good Faith and Fair Dealing (against Saxon and Ocwen) (Count I); Promissory Estoppel (against Saxon and Ocwen) (Count II); Violation of the Pennsylvania Unfair Trade Practices and Consumer Protection Law ("UTPCPL") (against Saxon and Ocwen) (Count III); and Violation of the Fair Debt Collection Practices Act (against Ocwen) (Count IV). Saxon has moved to dismiss the claims against it for failure to state claims upon which relief may be granted under Federal Rule of Civil Procedure 12(b)(6). We held oral argument on April 10, 2013.

## II.     LEGAL STANDARD

When considering a motion to dismiss pursuant to Rule 12(b)(6), we "consider only the complaint, exhibits attached to the complaint, [and] matters of public record, as well as undisputedly authentic documents if the complainant's claims are based upon these documents." Mayer v. Belichick, 605 F.3d 223, 230 (3d Cir. 2010) (citing Pension Benefit Guar. Corp. v. White Consol. Indus., Inc., 998 F.2d 1192, 1196 (3d Cir. 1993)). We take the factual allegations of the complaint as true and draw all reasonable inferences in favor of the plaintiff. Phillips v. Cnty. of Allegheny, 515 F.3d 224, 233 (3d Cir. 2008) (citing Pinker v. Roche Holdings Ltd., 292 F.3d 361, 374 n.7 (3d Cir. 2002)). Legal conclusions, however, receive no deference, and the court is "not bound to accept as true a legal conclusion couched as a factual allegation." Papasan v. Allain, 478 U.S. 265, 286 (1986) (cited with approval in Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007)).

A plaintiff's pleading obligation is to set forth "a short and plain statement of the claim," Fed. R. Civ. P. 8(a)(2), which gives the defendant "'fair notice of what the . . . claim is and the

grounds upon which it rests.'" Twombly, 550 U.S. at 555 (alteration in original) (quoting

Conley v. Gibson, 355 U.S. 41, 47 (1957)). The "complaint must contain sufficient factual

matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v.

Iqbal, 556 U.S. 662, 678 (2009) (quoting Twombly, 550 U.S. at 570). "The plausibility standard

is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a

defendant has acted unlawfully." Id. (quoting Twombly, 550 U.S. at 556). In the end, we will

dismiss a complaint if the factual allegations in the complaint are not sufficient "to raise a right

to relief above the speculative level." Twombly, 550 U.S. at 555 (citing 5 Charles Alan Wright

& Arthur R. Miller, Federal Practice and Procedure § 1216, at 235-36 (3d ed. 2004)).

## III. DISCUSSION

Saxon argues that we should dismiss Plaintiffs' claims against it for breach of contract

and breach of the implied duty of good faith and fair dealing, promissory estoppel, and violation

of the UTPCPL, pursuant to Federal Rule of Civil Procedure 12(b)(6) because the Complaint

fails to state claims against Saxon upon which relief may be granted.

### A. Breach of Contract and Breach of the Implied Duty of Good Faith and Fair Dealing (Count I)

The Complaint alleges that Saxon breached its TPPs with Plaintiffs by failing to offer

them permanent modifications after they complied with their obligations under the TPP.[2]

(Compl. ¶ 106.) In order to state a plausible claim for breach of contract, the Complaint must

_____

[2]Plaintiffs argue in the alternative that Saxon breached the TPPs by failing to send them timely notices of denial after determining that they were not qualified for permanent modifications. However, as explained below, the facts as alleged support the conclusion that Saxon determined that Plaintiffs were, in fact, qualified and yet it refused to provide them with permanent modifications. Because we conclude that the Complaint alleges a valid breach of contract claim based on these facts, we do not now consider Plaintiff's alternative argument, that Saxon breached the TPPs by failing to send Plaintiffs timely written denials.

allege "'(1) the existence of a contract, including its essential terms, (2) a breach of a duty imposed by the contract[,] and (3) resultant damages.'" Ware v. Rodale Press, Inc., 322 F.3d 218, 225 (3d Cir. 2003) (alteration in original) (quoting CoreStates Bank, N.A. v. Cutillo, 723 A.2d 1053, 1058 (Pa. Super. Ct. 1999)). Saxon acknowledges that the TPP is a contract that imposes certain obligations on both it and Plaintiffs, but argues that the Complaint fails to plausibly allege that Saxon had a duty under the TPP to provide Plaintiffs with permanent modifications, much less that it breached such a duty, and also fails to allege resultant damages.[3]

### 1. Breach of the TPP

Saxon argues that the Complaint fails to state a claim upon which relief may be granted because the TPP did not obligate Saxon to offer Plaintiffs permanent modifications under the circumstances alleged in the Complaint. Specifically, Saxon argues that the TPP does not require it to offer Plaintiffs permanent modifications unless Plaintiffs qualified for such modifications, and it contends that the Complaint fails to plausibly allege that Plaintiffs were, in fact, qualified. Saxon also argues that the TPP did not obligate it to permanently modify Plaintiffs' mortgages until it sent them a fully executed copy of a Modification Agreement, and the Complaint does not allege that Saxon ever sent either Plaintiff such a document. Saxon, however, misinterprets its duties and obligations under the TPP.

The TPP required Plaintiffs, upon applying for a modification, to make several representations regarding their financial status, including a certification that they are unable to

---

[3]At oral argument, Saxon also noted that HAMP does not provide for a private right of action. Plaintiffs, however, have not brought a claim under HAMP, but rather are trying to enforce the terms of the TPP. In these circumstances, it is inconsequential that HAMP affords no private right of action. See Wigod v. Wells Fargo Bank, N.A., 673 F.3d 547, 581-82 (7th Cir. 2012).

afford their mortgage payments and that their mortgages are in default.  (TPP § 1.)  The TPP further obligated Plaintiffs, if Saxon accepted their applications, to make three timely trial period payments.  (Id. § 2.)  The Introduction to the TPP unequivocally states that: "If [the borrower is] in compliance with this Trial Period Plan (the 'Plan') and [his] representations in Section 1 continue to be true in all material respects, then the Lender will provide [the borrower] with a Home Affordable Modification Agreement ('Modification Agreement'), as set forth in Section 3."  (TPP Introduction.)  The TPP further explains that "[i]f [the borrower] compl[ies] with the requirements in Section 2 and [his] representations in Section 1 continue to be true in all material respects, the Lender will send [him] a Modification Agreement for [his] signature which will modify [his] Loan Documents as necessary to reflect this new payment amount."  (Id. § 3.)

The conditions precedent to Saxon's obligation to provide Plaintiffs with permanent modifications are therefore twofold: (1) Plaintiffs' timely trial period payments, and (2) the continued validity of Plaintiffs' representations regarding their financial conditions and the conditions of their properties.  (Id.)  By signing their TPPs and returning them to Saxon, Plaintiffs represented that they understood that:

> [Saxon] will send me a signed copy of this Plan, if I qualify for the Offer, or will send me written notice that I do not qualify for the Offer.  This Plan will not take effect unless and until both I and [Saxon] sign it and [Saxon] provides me with a copy of this Plan with [Saxon's] signature.

(Id. Introduction.)

### a.    Determination of Qualification

Saxon argues that the Complaint does not plausibly allege that Saxon breached the terms of the TPP by failing to permanently modify Plaintiffs' mortgages, because the TPP makes clear that Saxon only had to provide permanent modifications if Plaintiffs qualified for permanent

modifications under HAMP guidelines, and the Complaint does not allege that Plaintiffs were qualified under those guidelines. However, the Complaint alleges that Plaintiffs each signed copies of their TPPs and submitted all requested financial information to Saxon. (Compl. ¶¶ 56, 73.) The Complaint also alleges that Saxon signed and returned the TPPs to Plaintiffs. (Id. ¶¶ 57, 74.) Under the terms of the TPP, Saxon would only return an executed TPP to the borrower if the borrower was, in fact, qualified. (See TPP Introduction.) Accordingly, we find that the Complaint adequately alleges that Plaintiffs were qualified for permanent modifications.[4]

In Wigod v. Wells Fargo Bank, N.A., 673 F.3d 547 (7th Cir. 2012), the United States Court of Appeals for the Seventh Circuit interpreted and analyzed a TPP identical to that issued to Plaintiffs. It concluded, like we do, that a mortgage servicer is required to make a determination regarding a borrower's qualifications for a modification under HAMP regulations upon receipt of the signed TPP, and that the servicer's return of an executed TPP to the borrower is a communication that the borrower is, in fact, qualified. Id. at 562. In Wigod, as in the instant case, the servicer signed the TPP and returned it to the borrower. Id. at 558. The Seventh Circuit described the course of events following the servicer's receipt of the signed TPP from the borrower as follows:

> Under the terms of the TPP Agreement, then, that moment was [the servicer's] opportunity to determine whether [the borrower] qualified. If she did not, it could have and should have denied her a modification on that basis. Instead, [the servicer] countersigned . . . . In so doing, [the servicer] communicated to [the borrower] that she qualified for HAMP and would receive a permanent "Loan

---

[4]We reject Saxon's suggestion that the Complaint must specifically allege that Plaintiffs satisfied each particular HAMP eligibility requirement. The Complaint sets forth the relevant HAMP regulations that Saxon was required to consult to determine Plaintiffs' eligibility for permanent modifications. (Compl. ¶¶ 31-38.) It also expressly alleges that Plaintiffs were "qualified" for permanent modifications. (Id. ¶¶ 61, 78.) These allegations, in conjunction with the allegation that Saxon returned the TPPs to Plaintiffs, thereby communicating that they were qualified, are sufficient to satisfy Plaintiffs' pleading requirements under the Federal Rules.

Modification Agreement" after the trial period, provided she was "in compliance with this Loan Trial Period and [her] representations . . . continue[d] to be true in all material respects."

Id. at 562 (last two alterations in original).[5]

In sum, we conclude that Saxon's theory that the TPP permitted it to determine whether Plaintiffs qualified under HAMP guidelines "after the trial period began . . . conflicts with the plain terms of the TPP." Id. As noted above, the TPP obligated Saxon, after it returned the executed TPPs to Plaintiffs, to provide Plaintiffs with permanent modifications as long as they "compl[ied] with the requirements in Section 2 and [their] representations in Section 1 continue[d] to be true in all material respects"—in other words, as long as they made all of their trial payments on time and their financial information continued to be true and accurate.[6] (TPP §

_____

[5]Notably, Plaintiffs' and the Wigod plaintiff's TPPs are materially different than the TPP at issue in Cave v. Saxon Mortg. Servs., Inc., Civ. A. No. 11-4586, 2012 WL 1957588 (E.D. Pa. May 30, 2012) ("Cave I"), a case which reached a different result than we reach here. The Cave I TPP stated in Section 2.G that "the Lender will not be obligated or bound to make any modification of the Loan Documents if the Lender determines that I do not qualify." Cave I, 2012 WL 1957588, at *4 n.6. Similarly, Section 3 of the Cave I TPP stated that "[i]f . . . the Lender determines that I qualify, the Lender will send me a Modification Agreement." Id. (alteration in original). The Cave I TPP thus permitted the servicer to determine, even after it signed and returned the TPP to the borrower, whether the plaintiffs qualified for permanent modification. Id. The instant TPP does not contain similar language, and, thus, does not similarly indicate that Saxon had yet to qualify Plaintiffs for permanent modifications at the time it signed and returned Plaintiffs' TPPs.

[6]Saxon also argues that it did not breach the TPP by refusing to give Plaintiffs permanent modifications, because it determined upon further review of Plaintiffs' documentation that they were not qualified for permanent modifications, and it was entitled to conduct that further review pursuant to the TPP requirement that, for Plaintiffs to secure permanent modifications, their financial representations had to continue to be true and accurate. However, we do not read the provision regarding continuing financial representations to permit Saxon to revisit its prior qualification decision based on a new assessment of previously submitted data. Moreover, contrary to Saxon's assertion, the Complaint alleges that Plaintiffs not only made all of their trial payments on time, but also performed all of their other obligations under their TPPs. (Compl. ¶¶ 60-61, 77-78.) We therefore reject Saxon's argument that the Complaint fails to state a valid

3.) See Wigod, 673 F.3d at 562; Pennington v. HSBC Bank USA, N.A., 493 F. App'x 548, 553-54 (5th Cir. 2012) (noting that after the borrower receives a signed copy of the TPP, "if the borrower no longer meets the criteria in Section 1 before the Modification Effective Date, his TPP will terminate, and he will be unable to receive a loan modification").

We therefore conclude that the Complaint plausibly alleges that Plaintiffs were qualified for permanent modifications. Accordingly, we reject Saxon's argument that, because the Complaint does not contain such an allegation, it fails to plausibly allege that Saxon breached the TPP.

b.      Receipt of a Modification Agreement

Saxon also argues that the Complaint fails to allege that Saxon ever sent Plaintiffs a fully executed copy of a Modification Agreement, which is a condition precedent to Saxon's obligation to provide Plaintiffs with permanent modifications. Section 2.F of the TPP states that Plaintiffs will not receive permanent modifications if, "prior to the Modification Effective date, (i) [Saxon] does not provide [Plaintiffs] a fully executed copy of this Plan and the Modification Agreement." (TPP § 2.F.) Section 2.G of the TPP explains that Saxon will not provide Plaintiffs with permanent modifications "unless and until" Plaintiffs "receive a fully executed copy of a Modification Agreement." (Id. § 2.G).

Saxon argues that, under these provisions, Plaintiffs had no entitlement to permanent modifications because Saxon did not send them a Modification Agreement. We reject Saxon's interpretation of these provisions. Read naturally, Sections 2.F and 2.G simply "set forth reasons why a permanent modification *would not occur automatically* upon the expiration of the three-

---

claim of breach of contract because it was entitled under the TPP to deny permanent modifications to Plaintiffs upon reassessment of its prior qualification decision.

month trial period." Cave I, 2012 WL 1957588, at *5; see Wigod, 673 F.3d at 563 (stating that the "more natural interpretation is to read the provision as saying that no permanent modification *existed*" until the loan servicer sent to the plaintiff the contract for permanent modification, and that this provision did not affect the loan servicer's obligation to provide a permanent modification).  Saxon's reading of Sections 2.F and 2.G is contrary to Saxon's clear obligation under the TPP to provide permanent modifications if Plaintiffs made all trial payments and their financial information continued to be true and accurate.  (See TPP § 3.)  Thus, we conclude that Saxon's interpretation of Sections 2.F and 2.G "conflicts with the clear tenor of the remainder of the document" and "would render the other apparent promises in the document illusory." Gaudin v. Saxon Mortg. Servs., Inc., 820 F. Supp. 2d 1051, 1054 (N.D. Cal. 2011).

For the foregoing reasons, we reject Saxon's argument that it had no obligation to provide permanent modifications to Plaintiffs because it did not send them an executed Modification Agreement.  We therefore reject Saxon's argument that, because it had not satisfied that obligation, the Complaint fails to plausibly allege that it breached the TPP.

### 2.    Damages

Saxon argues that the Complaint does not adequately allege any damages that resulted from its alleged breach of contract.  To recover damages for breach of contract, Plaintiffs "must show a causal connection between the breach and the loss."  Logan v. Mirror Printing Co. of Altoona, Pa., 600 A.2d 225, 226 (Pa. Super. Ct. 1991) (citations omitted).  Recoverable damages must be (1) "such as would naturally and ordinarily result from the breach," (2) "reasonably foreseeable and within the contemplation of the parties at the time they made the contract," and (3) capable of proof "with reasonably certainty."  Ferrer v. Trustees of Univ. of Pa., 825 A.2d 591, 610 (Pa. 2002) (quoting Taylor v. Kaufhold, 84 A.2d 347, 351 (Pa. 1951)).

The Complaint alleges that, as a result of Saxon's breach of Plaintiffs' TPPs—that is, its denial of permanent modifications to which Plaintiffs were entitled under the terms of their TPPs—Plaintiffs have suffered "payment of increased interest, longer loan payoff times, higher princip[al] balances, deterrence from seeking other remedies to address their default and/or unaffordable mortgage payments, damage to their credit, additional income tax liability, [and] costs and expenses incurred to prevent or fight foreclosure." (Compl. ¶ 108.) Saxon argues that these damages were not the result of its refusal to provide Plaintiffs with permanent modifications, that they would have arisen in any event because Plaintiffs' mortgages were in default, and that they were the result of Plaintiffs' decisions to seek HAMP modifications.

However, as alleged in the Complaint and under the terms of the TPP, had Saxon provided Plaintiffs with permanent modifications upon the completion of their trial periods, Plaintiffs would only thereafter pay modified, i.e. reduced, monthly payments on their mortgages. (See TPP § 3.) The Complaint also alleges that permanent modifications would have capitalized Plaintiffs' accrued interest, reduced their interest rate, extended the terms of their loans, and provided principal forbearances. (Compl. ¶ 32.) The Complaint alleges that Saxon did not provide Plaintiffs with permanent modifications, and thus, their mortgage payments were never reduced and they never received those other financial benefits that permanent modifications would have bestowed. (Id. ¶¶ 61, 78, 106, 108.) If Saxon had provided Plaintiffs with permanent modifications, it is reasonable to infer that they would not have incurred, *inter alia*, increased principal, interest, and longer loan payoff times that accrued after the end of their trial periods, and may have sought other remedies to address their unaffordable mortgage payments. See Cave I, 2012 WL 1957588, at *8; Belyea v. Litton Loan Servicing, LLP, Civ. A. No. 10-10931, 2011 WL 2884964, at *9 (D. Mass. July 15, 2011) (stating that the

plaintiffs plausibly alleged damages for breach of a TPP "in terms of accrued . . . fees and charges in the period during which [the defendant] allegedly should have tendered a permanent loan modification" and "in terms of relief foregone by the Plaintiffs during that same period"); Durmic v. J.P. Morgan Chase Bank, NA, 2010 WL 4825632, at *3 (D. Mass. Nov. 24, 2010) ("Plaintiffs have pled that with each passing month, their original loan documents remain in effect, subjecting them to the accrual of charges, a further risk of delinquency, damage to their credit ratings, and a heightened risk of eventually losing their homes to foreclosure.").

For all of the foregoing reasons, we conclude that the Complaint plausibly alleges that Saxon breached the terms of Plaintiffs' TPPs, and that Plaintiffs were damaged by that breach. Accordingly, we deny the Motion as to Plaintiffs' breach of contract claim.[7]

B.      Promissory Estoppel (Count II)

The Complaint alleges that Saxon is estopped from denying the existence of a contract between it and Plaintiffs because the TPPs were intended to, and did, induce Plaintiffs to rely on Saxon's promises, and that reliance was detrimental to Plaintiffs.  (Compl. ¶ 113.)  The doctrine of promissory estoppel enforces "'[a] promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee or a third person and which does induce

---

[7]The Complaint also alleges that Saxon breached its implied duty of good faith and fair dealing.  (Compl. ¶¶ 100-09.)  "'Every contract imposes on each party a duty of good faith and fair dealing in its performance and its enforcement.'"  Kaplan v. Cablevision of Pa., Inc., 671 A.2d 716, 722 (Pa. Super. Ct. 1996) (quoting Restatement (Second) of Contracts § 205).  Saxon argues that the Complaint does not plausibly allege a breach of the implied duty of good faith and fair dealing, or a claim for promissory estoppel, because the TPP does not contain an enforceable contractual promise to provide Plaintiffs with permanent modifications.  Because we have already found that the TPP requires Saxon to provide Plaintiffs with permanent modifications if Plaintiffs complied with their obligations under the TPP, we reject Saxon's argument to the contrary, and deny its Motion to the extent that it seeks to dismiss Plaintiffs' claims on that basis.  See Durmic, 2010 WL 4825632, at *5.

such action or forbearance . . . if injustice can be avoided only by enforcement of the promise.'" <u>Edwards v. Wyatt,</u> 335 F.3d 261, 277 (3d Cir. 2003) (first alteration in original) (quoting <u>Thatcher's Drug Store of W. Goshen, Inc. v. Consol. Supermarkets, Inc.</u>, 636 A.2d 156, 160 (Pa. 1994)).

Saxon argues that the Complaint does not allege that Plaintiffs reasonably relied on any of Saxon's alleged promises under the TPP. The Complaint alleges that had Saxon informed Plaintiffs that it "never intended to modify their loans as promised, they would have foregone the entire modification process." (<u>Id.</u> ¶ 3.) We find this allegation in the Complaint, coupled with the allegation that Plaintiffs made their trial period payments on time as set forth in the TPP, are sufficient to allege that Plaintiffs relied on Saxon's promise that it would provide permanent modifications if Plaintiffs complied with their obligations under the TPP. <u>See</u> <u>Wigod</u>, 673 F.3d at 566 (finding that the complaint adequately alleged reliance based on defendant's promise to provide permanent modifications). Moreover, Plaintiffs' promissory estoppel claim is asserted in the alternative to their breach of contract claim. Because one or more of Saxon's contract defenses may remain viable going forward, Plaintiffs may need to rely on their promissory estoppel claim in the event that we later conclude as a factual matter that an enforceable contract did not exist. <u>See</u> <u>Durmic</u>, 2010 WL 4825632, at *5 (denying a motion to dismiss the plaintiff's promissory estoppel claim where the complaint alleged a viable breach of the TPP). Accordingly, we deny the Motion as to Plaintiffs' promissory estoppel claim.

C. <u>Violation of the UTPCPL (Count III)</u>

Saxon argues that the Complaint fails to state a UTPCPL claim upon which relief may be granted because it does not allege deceptive conduct, justifiable reliance, or injury, all of which

are necessary elements of a viable UTPCPL claim. Saxon also argues that the economic loss doctrine bars Plaintiffs' UTPCPL claim.

### 1. Elements of a UTPCPL Claim

The UTPCPL prohibits "[u]nfair or deceptive acts or practices in the conduct of any trade or commerce." 73 Pa. Stat. § 201-3. The statute prohibits, in the catchall provision, "fraudulent or deceptive conduct which creates a likelihood of confusion or of misunderstanding" in the conduct of trade or commerce. 73 Pa. Stat. § 201-2(4)(xxi). To state a plausible claim under the UTPCPL, the Complaint must allege that: "(1) [Plaintiffs] purchased or leased goods or services primarily for a personal, family, or household purpose; (2) [Plaintiffs] suffered an ascertainable loss of money or property; and (3) the loss occurred as a result of the use or employment by a person of a method, act, or practice declared unlawful by the UTPCPL." Baynes v. George E. Mason Funeral Home, Inc., Civ. A. No. 09-153, 2011 WL 2181469, at *4 (W.D. Pa. June 2, 2011) (citing 73 Pa. Stat. § 201-9.2(a)). The Complaint must also allege that Plaintiffs justifiably relied on the deceptive conduct. See Hunt v. U.S. Tobacco Co., 538 F.3d 217, 224 (3d Cir. 2008) (concluding that "plaintiffs alleging deceptive conduct under the . . . catchall provision must allege justifiable reliance"). In other words, the Complaint must allege that knowledge of the deceptive conduct "would have changed [Plaintiffs'] conduct." Id. at 227.

The Complaint alleges that Saxon "strung [Plaintiffs] along in an extended trial period and instructed [them] to continue to mak[e] modified payments" even though their temporary trial periods had ended and they were entitled to permanent modifications. (Compl. ¶¶ 62, 79.) The Complaint also alleges that during this time, Saxon provided Plaintiffs with "erroneous and misleading information" about their mortgages. (Id. ¶¶ 65, 81.) Moreover, the Complaint alleges that Saxon "failed to provide [Cave] any guidance whatsoever" about his mortgage (id. ¶

17

63), and failed to cooperate with Smith with respect to her application for a HEMAP loan. (Id. ¶ 82.)

Saxon argues that these allegations do not constitute deceptive conduct because they are based on Saxon's alleged failure to perform its contractual obligations under the TPP, and a failure to perform under a contract is not actionable deceptive conduct under the UTPCPL. See Horowitz v. Fed. Kemper Life Assurance Co., 57 F.3d 300, 307 (3d Cir. 1995) (noting that contractual nonfeasance is not actionable under the UTPCPL (citations omitted)). However, as detailed above, Saxon's allegedly deceptive conduct occurred after Plaintiffs' trial periods had ended, and after the point at which Plaintiffs were entitled to permanent modifications. We conclude that Saxon's representations to Plaintiffs after their trial periods ended, in assuring them that they were still in trial periods and giving them erroneous and misleading information about their mortgages, were made separate and apart from any of Saxon's obligations under the TPPs. Furthermore, the Complaint's allegations that Saxon failed to provide Cave with accurate information about his mortgage, and failed to assist Smith in obtaining a HEMAP loan, are wholly unrelated to Saxon's alleged failure to perform its contractual obligations under the TPPs. See Cave I, 2012 WL 1957588, at *10 (finding that Saxon's allegedly false instructions to plaintiffs to make modified payments, and its failure to help a plaintiff obtain a HEMAP loan, constituted deceptive conduct under the UTPCPL). Thus, we conclude that the Complaint adequately alleges deceptive conduct under the UTPCPL.[8]

---

[8] The Complaint also alleges that Saxon engaged in deceptive conduct by "illegally collecting late fees and penalties." (Compl. ¶ 123.) Saxon argues that the collection of these late fees do not constitute deceptive conduct under the UTPCPL. We conclude that the Complaint does not state sufficient facts for us to find that the collection of late fees, in itself, constitutes deceptive conduct upon which Plaintiffs relied, as required to state a viable UTPCPL claim.

Saxon also argues that the Complaint fails to adequately allege that Plaintiffs relied on Saxon's allegedly deceptive conduct. Specifically, Saxon argues that the Complaint does not allege that Plaintiffs would not have signed their TPPs if Saxon had informed them that they were not automatically entitled to permanent modifications. However, the Complaint alleges that Plaintiffs would "have foregone the entire modification process" if they had known that Saxon "never intended to modify their loans as promised." (Compl. ¶ 3.) Moreover, the Complaint alleges that Plaintiffs continued to make trial period payments after their trial periods ended, and paid excessive fees and penalties, based on Saxon's assurances that their trial periods were ongoing. (Id. ¶¶ 62, 65, 79, 81.) We find it reasonable to infer from the allegations in the Complaint that Plaintiffs relied on, and were deterred from seeking other remedies based on, Saxon's assurances that they were still in temporary trial plans even after those trial plans had ended, and based on Saxon's failure to provide Plaintiffs with accurate information about their mortgages. It is also reasonable to infer that Smith relied on Saxon's cooperation in applying for a HEMAP loan. We therefore conclude that the Complaint adequately alleges that Plaintiffs relied on Saxon's deceptive conduct in violation of the UTPCPL.

Saxon further argues that the Complaint fails to adequately allege that Plaintiffs were injured as a result of Saxon's allegedly deceptive conduct. Saxon argues that Plaintiffs' inability to make full monthly payments under the terms of their original loan documents was the root cause of any damages that they suffered, and that they would have incurred additional interest, principal, or other costs regardless of whether their loans were permanently modified.

The Complaint alleges that, as a result of Saxon's deceptive conduct in assuring Plaintiffs that they were still in temporary trial periods, providing them with erroneous and misleading information, and failing to assist Smith in applying for a HEMAP loan, Plaintiffs suffered

"payment of increased interest and service fees, longer loan payoff times, higher princip[al] balances, deterrence from seeking other remedies . . ., damage to their credit, additional income tax liability, costs and expenses incurred to prevent or fight foreclosure, and other damages." (Compl. ¶ 125.)  In addition, the Complaint alleges that Saxon charged Cave's escrow account in the amounts of $276.00 and $821.00 for fire insurance and $2,632.22 for school taxes that Cave had already paid.  (Id. ¶ 65.)  With respect to Smith, the Complaint alleges that as a result of Saxon's failure to cooperate in her application for a HEMAP loan, she never received an emergency loan to help her with her mortgage payments.  (Id. ¶¶ 81-82.)  Based on all of these allegations, we conclude that the Complaint adequately alleges that Plaintiffs' damages were the result of Saxon's allegedly deceptive conduct in violation of the UTPCPL, and would not have been incurred in the absence of such conduct.  We therefore conclude that the Complaint plausibly alleges deceptive conduct, justifiable reliance, and injury under the UTPCPL, and we reject Saxon's arguments to the contrary.

2.     The Economic Loss Doctrine

Saxon argues that Plaintiffs' UTPCPL claim is barred by the economic loss doctrine. The economic loss doctrine "'prohibits plaintiffs from recovering in tort economic losses to which their entitlement flows only from a contract.'"  Werwinski v. Ford Motor Co., 286 F.3d 661, 671 (3d Cir. 2002) (quoting Duquesne Light Co. v. Westinghouse Elec. Corp., 66 F.3d 604, 618 (3d Cir. 1995)).  Consequently, the doctrine limits plaintiffs to their contract claims "'when loss of the benefit of a bargain is the plaintiff[s'] sole loss.'"  Bohler-Uddeholm Am., Inc. v. Ellwood Grp., Inc., 247 F.3d 79, 104 (3d Cir. 2001) (quoting Duquesne Light, 66 F.3d at 618). To avoid application of the economic loss doctrine, plaintiffs must articulate "harm that is distinct from the disappointed expectations evolving solely from an agreement."  Sunburst Paper,

LLC v. Keating Fibre Int'l, Inc., Civ. A. No. 06-3959, 2006 WL 3097771, at *3 n.3 (E.D. Pa. Oct. 30, 2006) (citation omitted).

The Complaint's specific allegations of damages that resulted from Saxon's violation of the UTPCPL are similar to those that the Complaint alleges Plaintiffs suffered as a result of Saxon's alleged breach of contract. (Compare Compl. ¶ 108 with id. ¶ 125.) However, the Complaint also alleges that Saxon charged Cave's escrow account for fire insurance that he already had in place, and for school taxes that he had already paid. (Id. ¶ 65.) The Complaint further alleges that Saxon failed to cooperate with and assist Smith in applying for a HEMAP loan, which resulted in her failing to receive an emergency loan to help bring her mortgage payments current. (Id. ¶ 82.)

Reading the allegations of the Complaint liberally, we cannot conclude that the Complaint does not allege damages that are separate and distinct from those resulting from Plaintiffs' breach of contract claim. The damages that resulted from Saxon's allegedly deceptive conduct in assuring Plaintiffs that they were still in their temporary trial plans after those plans had ended, by providing erroneous and misleading information about their mortgages, and by frustrating Smith's attempts to obtain a HEMAP loan, are likely different from those damages resulting from Saxon's alleged breach of Plaintiffs' TPPs. See Haymond v. Lundy, Civ. A. Nos. 99-5015, 99-5048, 2000 WL 804432, at *8 (E.D. Pa. June 22, 2000) (noting that a court should exercise "caution . . . in dismissing a tort action on a motion to dismiss because whether tort and contract claims are separate and distinct can be a factually intensive inquiry." (citations omitted)). Therefore, we decline to conclude that Plaintiffs' UTPCPL claim is barred by the economic loss doctrine.

For all of these reasons, we conclude that the Complaint alleges sufficient facts to state a plausible UTPCPL claim, and accordingly, we deny the Motion as to Plaintiffs' UTPCPL claim.

**IV.    CONCLUSION**

For the foregoing reasons, we deny the Motion in its entirety.   An appropriate order follows.

BY THE COURT:

/s/ John R. Padova
_____
John R. Padova, J.