IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| LISA and SCOTT CAVE, on behalf of themselves and all others similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> SAXON MORTGAGE SERVICES, INC., <br><br><br> Defendant. | Civ. A. No. 11-4586 |
| WILLIAM D. CAVE, on behalf of himself and all others similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> SAXON MORTGAGE SERVICES, INC., <br><br><br> Defendant. | Civ. A. No. 12-5366 |

**<ins>MEMORANDUM</ins>**

**Padova, J.**                                                **March 3, 2016**

　　　　We previously granted in part a Motion by Plaintiffs to strike the expert report submitted

by Defendant Saxon Mortgage Services, Inc. in support of its opposition to Plaintiffs' Motion for

Class Certification.  <u>Cave v. Saxon Mortg. Servs., Inc.</u>, Civ. A. No. 11-4586, 2015 WL 6153754

(E.D. Pa. Oct. 19, 2015) ("the October Opinion").  We held in pertinent part that portions of the

report submitted Dr. Marsha Courchane failed the "fit" prong of <u>Daubert v. Merrell Dow Pharm.,</u>

<u>Inc.</u>, 509 U.S. 579 (1993).  Presently before the Court is a Motion by Saxon to reconsider that

ruling.  We grant the Motion in part because, in drafting the earlier Opinion, we failed to

properly limit the holding to the proposed class to which the problems that were identified are specifically related, i.e. the <u>Cave I</u> Class.

## I.     STANDARD OF REVIEW

Federal Rule of Civil Procedure 59(e) allows a party to bring a motion for reconsideration in order to correct "manifest errors of law or fact or to present newly discovered evidence." <u>Harsco Corp. v. Zlotnicki</u>, 779 F.2d 906, 909 (3d Cir. 1985); see also <u>Kennedy Indus., Inc. v. Aparo</u>, Civ. A. No. 04-5967, 2006 WL 1892685, at *1 (E.D. Pa. July 6, 2006). The United States Court of Appeals for the Third Circuit has stated that the party seeking reconsideration must demonstrate "at least one of the following grounds: (1) an intervening change in the controlling law; (2) the availability of new evidence that was not available when the court granted the motion. . .; or (3) the need to correct a clear error of law or fact or to prevent manifest injustice." <u>Max's Seafood Café ex rel. Lou-Ann, Inc. v. Quinteros</u>, 176 F.3d 669, 677 (3d Cir. 1999).

Given a court's interest in the finality of its judgments, "[m]otions for . . . reconsideration should be granted sparingly and may not be used to rehash arguments which have already been briefed by the parties and considered and decided by the Court." <u>PBI Performance Prods., Inc. v. NorFab Corp.</u>, 514 F. Supp. 2d 732, 744 (E.D. Pa. 2007) (alternations in original) (internal citation and quotation marks omitted). Reconsideration is not permitted simply to allow a "second bite at the apple." <u>Bhatnagar v. Surrendra Overseas Ltd.</u>, 52 F.3d 1220, 1231 (3d Cir. 1995). "It is improper on a motion for reconsideration to ask the Court to rethink what [it] had already thought through — rightly or wrongly." <u>Glendon Energy Co. v. Borough of Glendon</u>, 836 F. Supp. 1109, 1122 (E.D. Pa. 1993) (internal citation and quotation marks omitted). "Mere

dissatisfaction with the court's ruling is not a proper basis for reconsideration." E.E.O.C. v. Dan Lepore & Sons Co., Civ. A. No. 03-5462, 2004 WL 569526, at *2 (E.D. Pa. Mar. 15, 2004).

## II.  BACKGROUND

a.  Cave I

Lisa and Scott Cave, the Cave I Plaintiffs, seek to represent a class consisting of all Pennsylvania homeowners with home mortgage loans serviced by Saxon, who, since April 13, 2009, have entered into TPP contracts, made all payments required by their TPPs on time, complied with Defendant's requests for financial documentation, did not receive a permanent HAMP modification, and did not receive timely written notification of the reason for denying the permanent modification.  (Civ. A. No. 11-4586, Docket Entry 99 at 2.)  The Complaint alleges causes of action for breach of contract/breach of the duty of good faith and fair dealing (Count I); promissory estoppel (Count II); violation of the Pennsylvania Unfair Trade Practices and Consumer Protection Law (Count III); violation of the Pennsylvania Fair Credit Extension Uniformity Act (Count IV); and violation of the Fair Debt Collection Practices Act (Count V).

On May 30, 2012, we issued an Opinion denying Saxon's Motion to Dismiss Plaintiffs' Complaint in Cave I.  Cave v. Saxon Mortg. Servs., Inc., Civ. A. No. 11-4586, 2012 WL 1957588 (E.D. Pa. May 30, 2012) ("the May 2012 Opinion").  We rejected Saxon's argument that the Plaintiffs' TPP contract "was essentially an application for a permanent [loan] modification and, as such, contained no enforceable promises." Id. at *4.  We held that Plaintiffs plausibly had alleged the elements of a binding contract, subject to two conditions precedent, and plausibly had alleged that the contract was breached by Saxon's failure to provide them a permanent loan modification or provide timely notice of denial.  Id. at *5 ("We therefore conclude that the TPP contains a clear promise that Saxon will provide Plaintiffs with a

permanent modification if several conditions precedent are met.  However, it is clear that Saxon was only obligated to provide a permanent modification if Plaintiffs qualified.")  We rejected Saxon's arguments that two provisions in the TPP, Sections 2.F and 2.G — providing that there will be no permanent modification if (2) "Lender does not provide me a fully executed copy of the Plan and the Modification Agreement" or (2) unless Plaintiffs "receive a fully executed copy of the Modification Agreement — negated the finding of a binding obligation.  Id.  We stated that these provisions, "rather than giving Saxon unfettered discretion as to its obligations under the TPP, simply set forth reasons why the permanent modification *would not occur automatically* upon the expiration of the three-month trial period."  Id. (emphasis in original).  We held that Saxon's interpretation of these two sections "contradicts other provisions in the TPP that unequivocally state that Saxon will provide a permanent modification if Plaintiffs qualify and other conditions are met.  Saxon's interpretation . . . 'conflicts with the clear tenor of the remainder of the document and would render the other agreement promises illusory.'"  Id. (citation omitted).

Finding that Plaintiffs plausibly had alleged a binding agreement, we went to hold that they plausibly had alleged a breach of the TPP on both of the two alternate theories of their breach of contract claim.

> We do not agree that Plaintiffs have failed to allege that they qualified for a permanent modification.  Admittedly, the Complaint does not contain any explicit allegation that Plaintiffs qualified for permanent modification under HAMP's Guidelines.  The Complaint does, however, generally allege that Plaintiffs satisfied all conditions precedent under the TPP.  (Compl. ¶¶ 57, 60, 94.)  As Saxon acknowledges, whether Plaintiffs qualified was a condition precedent to permanent modification, and under the Federal Rules of Civil Procedure, it is sufficient for a plaintiff to allege generally that all conditions precedent were satisfied.  See Fed. R. Civ. P. 9(c).  Moreover, the Complaint as a whole would not make any sense if Plaintiffs were not alleging that they were qualified.  The Complaint alleges numerous times that Saxon breached the TPP by not offering Plaintiffs a permanent modification which, as discussed, would only be the case if

Plaintiffs qualified. (E.g. Compl. ¶¶ 59, 93.) Accordingly, we find that the Complaint alleges that Saxon breached the TPP by not offering Plaintiffs a permanent modification.

We also find that the Complaint plausibly alleges in the alternative that, even if Plaintiffs were not qualified for permanent modification, Saxon breached the TPP because it did not send Plaintiffs a timely written denial explaining why they did not qualify. The Complaint only alleges that Plaintiffs were informed over the telephone that they did not qualify for permanent modification; there are no allegations about any written denial from Saxon. Accordingly, we conclude that the Complaint adequately alleges, in the alternative, that Saxon breached the TPP by not sending a written denial if Plaintiffs did not qualify for permanent modification.

Id. at *7.

Central to Saxon's Motion for Reconsideration is the following language we included in the May 2012 Opinion after concluding that Plaintiffs plausibly had alleged a breach under either theory: "as the TPP contains no express provision stating when Saxon had to send a written denial, the implied covenant of good faith and fair dealing may ultimately be the only aspect of the TPP that Saxon breached." Id. at *8. Saxon's Motion focuses on the statement that "the TPP contains no express provision stating when Saxon had to send a written denial" to seek reconsideration of our ruling on the Courchane Report.

b.    Cave II

William Cave, the Cave II Plaintiff, seeks to represent a multistate class of all borrowers in Arizona, Hawaii, Idaho, Illinois, Indiana, Maine, Massachusetts, Montana, Nevada, Oregon, Pennsylvania, Rhode Island, Washington, and Wisconsin, whose loans have been serviced by Saxon and, who, during the period between April 2009 and October 2009: (1) entered into TPP Contracts with Saxon that are substantially similar to Plaintiff William Cave's TPP Contract and that Saxon countersigned and returned to the borrowers, (2) made all monthly payments as required by their respective TPP Contracts, and (3) did not receive permanent Home Affordable Modifications by the Modification Effective Date set forth in their respective TPP Contracts.

(Civ. A. No. 12-5366, Docket Entry 99 at 2.)  In contrast to the <u>Cave I</u> class, the <u>Cave II</u> Class is not a failure to notify class; it is an eligibility class.  The <u>Cave II</u> Complaint raises the same claims as the <u>Cave I</u> Complaint, with the exception of claim for violation of the Pennsylvania Fair Credit Extension Uniformity Act.  (<u>See id.</u>, Docket Entry 55.)

In May 2013, we issued an Opinion denying Saxon's Motion to Dismiss the <u>Cave II</u> case — a case whose class definition requires that a borrower received a countersigned, returned TPP. <u>Cave II</u>, Civ. A. No. 12-5366, 2013 WL 1915660 (E.D. Pa. May 9, 2013) ("the May 2013 Opinion").  We stated in that decision that a "mortgage servicer is required to make a determination regarding a borrower's qualifications for a modification under HAMP regulations upon receipt of the signed TPP, and that the servicer's return of an executed TPP to the borrower is a communication that the borrower is, in fact, qualified."  <u>Id.</u> at *6.  We held that the "TPP obligated Saxon, after it returned the executed TPP to Plaintiffs, to provide Plaintiffs with permanent modifications as long as they 'compl[ied] with the requirements in Section 2 and [their] representations in Section 1 continue[d] to be true in all material respects' – in other words, as long as they made all of their trial payments on time and their financial information continued to be true and accurate.  <u>Id.</u> at *6 (alterations in original) (quoting TPP § 3).  We concluded "that Saxon's theory that the TPP permitted it to determine whether Plaintiffs qualified under HAMP guidelines 'after the trial period began . . . conflicts with the plain terms of the TPP.'"  <u>Id.</u> (deletion in original).  We reiterated that, unless Saxon determined that during the trial period the borrower did not continue to qualify for a permanent modification, the permanent modification would occur automatically at the end of the trial period.  <u>Id.</u> at *7.

c.      The October Opinion

In the October Opinion, we held that Dr. Courchane's critique of Plaintiffs' expert, Dr.

Ian Ayers, failed the fit test for two reasons:

> First, while we held that Saxon's countersigning the named Plaintiffs' TPP
> created a binding obligation (subject to two conditions precedent) to provide the
> permanent modification or issue a timely denial notice, Dr. Courchane disregards
> this ruling. Second, while the TPP itself provides for a "Modification Effective
> Date," by which Saxon was required to issue a denial or provide the permanent
> modification, Dr. Courchane relies upon parol evidence in concluding that the
> Modification Effective Date means something other than what it unambiguously
> states.

October Opinion, 2015 WL 6153754, at *4.  On the Modification Effective Date ("MED") issue,

we noted that the TPP provided:

> If prior to the Modification Effective Date (i) the Lender does not provide me a
> fully executed copy of this Plan and the Modification Agreement; (ii) I have not
> made the Trial Period payments required under Section 2 of this Plan; or (iii) the
> Lender determines that my representations in Section 1 are no longer true and
> correct, the Loan Documents will not be modified and this Plan will terminate.

Id. at *7.  Dr. Ayers asserted that class members could be identified through common evidence

and methods because borrowers who did not receive (1) a timely permanent modification or (2)

notice that they were ineligible for a permanent modification could be determined using data

Saxon reported to Treasury.  (See Ayers Report ¶¶ 70-74.)  He stated that, under the terms of the

TPP, "Servicers did not have an unlimited period of time to verify the initial information used to

qualify a borrower for HAMP.  In every TPP, the 'trial period' is a defined term that ends on the

MED."  October Opinion at *7 (quoting Ayers Report ¶ 40).  In her Report, Dr. Courchane

disputed this assertion, opining that:

> Dr. Ayers assumes that the MED for each TPP was three or four months after the
> trial period began ("Trial MED"), which may well not have been the case. The
> Trial MED is the anticipated MED of the official loan modification, subject to
> Treasury guidelines and requirements. The Official MED is the actual
> Modification Effective Date of an official loan modification, if one is issued.

Clearly, Treasury anticipated some differences between the anticipated (ex ante) and actual or official (ex post) MED dates.

Id. at *6 n. 14 (quoting Courchane Report ¶ 16.)  We rejected Dr. Courchane's attempt to distinguish between an "anticipated MED" and an "official MED."  We stated that:

> The TPP itself unambiguously sets the date upon which Saxon was required to issue a permanent modification or terminate the Plan.  Time of performance is an essential term to a contract to which there must be agreement for the contract to be binding. . . .  Notably, the TPP itself declares in the same portion that contains the MED clause that "TIME IS OF THE ESSENCE under this Plan." (Ex. D, § 2.) Dr. Courchane's reference to parol evidence material outside the contract — Treasury's HAMP Data Dictionary — in an attempt to explain or vary the unambiguous terms contained therein is inappropriate.

Id. at *7 (footnote and internal citations omitted).

## III.    THE PENDING MOTION

### a.    The MED Issue

Citing the language quoted above from the May 2012 Opinion that "the TPP contains no express provision stating when Saxon had to send a written denial," Saxon argues that in the October Opinion, we "held for the first time in this litigation that the TPP *does contain* an express provision setting a deadline for notice of denial," namely the Modification Effective Date listed in the TPP.  (Def. Mem. at 1 (emphasis in original).)  Saxon argues that (1) it had no opportunity to be heard on the issue of whether the MED provision is ambiguous, (2) the MED provision contains a latent ambiguity for which extrinsic evidence could be offered, and (3) "linking the MED to the denial-notice obligation  . . . ignores the plain language of the TPP[,] which nowhere expresses a deadline for notice of denial."  (Id. at 2 (parenthetical omitted).) Plaintiffs respond that Saxon had numerous opportunities to address the issue and is merely repeating arguments it has already advanced on the meaning and enforceability of the TPP contracts.  They note that our October Opinion was simply an evidentiary ruling, limited to

whether Courchane's opinions were reliable, and was consistent with the relief sought by them in their Motion to Strike, which was fully briefed by the parties.

In making its reconsideration arguments, Saxon distinguishes the <u>Cave I</u> class definition from the <u>Cave II</u> class definition.  It stresses that, while the <u>Cave II</u> class is defined by eligibility for a HAMP modification, the <u>Cave I</u> class is defined as borrowers who never received a modification or a timely notice of denial.  It asserts that the "entire focus of Plaintiffs' challenge to Dr. Courchane with respect to the MED was geared toward the <u>Cave II</u> Class, which seeks liability based on denying permanent modifications to eligible borrowers.  The notice claim is solely a creature of the <u>Cave I</u> Class, to which Plaintiffs concede Dr. Courchane's opinions 'fit.'" (Def. Mem. at 7-8.)  Saxon concedes, nonetheless, that "both retained experts tended [to] shift fluidly between discussing the two classes at issue here."  (<u>Id.</u> at 8.)

Saxon's last point, that both experts tended to shift fluidly between discussing the two cases, is certainly true.  For example, Dr. Courchane began her analysis by stating that, "[f]or both the <u>Cave I</u> and <u>Cave II</u> classes, Plaintiffs allege harm to borrowers who received a TPP, made their TPP payments as scheduled, complied with documentation requirements and did not receive a permanent loan modification."  (Courchane Report ¶ 13.)  Thus, Saxon's own expert failed to distinguish the very point Saxon now raises, namely that the <u>Cave I</u> Class, which attempts to prove a "timely notice" claim, and not an eligibility claim, must be assessed separately from the <u>Cave II</u> Class.  Notably, Dr. Courchane went on to opine that "the classes [plural] proposed by Plaintiffs cannot be identified reliably without review of loan file documentation and documentation regarding the requirements of the HAMP program established by the U.S. Department of the Treasury ("Treasury") and regarding the circumstances and actions of individual borrowers and of Saxon."  (<u>Id.</u> ¶ 15.)  Further, she made no attempt to draw

any distinctions between the two classes in leveling her key criticisms of Dr. Ayers.  (See, e.g., id. ¶ 16 ("Dr. Ayres assumes that the Modification Effective Date for each TPP was three or four months after the trial period began ("Trial MED"), which may well not have been the case."); id. ¶ 17 ("A putative class member's submission of a signed TPP and submission of documentation required by Treasury for the purpose of evaluating HAMP eligibility are not sufficient bases for concluding that the class member actually qualified for a permanent modification."); id. ¶ 20 ("Dr. Ayres also has not identified a method for determining whether and when denial letters were sent to any given borrower other than reviewing that borrower's individual loan servicing notes history."); id. ¶ 21 ("Dr. Ayres did not offer a reliable method for determining the Modification Effective Date applicable to each putative class member.  As I discuss in Section 6.2, among other things, he has not provided a workable method to account for HAMP trial period extensions that were available or required under HAMP.").)  Apparently, she found it largely unnecessary to make a differentiation between the classes because, she stated, both the Cave I and Cave II classes involved borrowers who used the same form of TPP contract.  (See id. ¶ 42 ("The Cave II "Multistate Class" includes, by definition, only Path 1 borrowers who received TPPs between April and October 2009.  The other Cave II classes, and the Cave I classes, can only potentially include Path 1 borrowers, as both William Cave and Lisa and Scott Cave's applications were Path 1 applications.").)

We directly commented on the lack of specificity of both experts in the October Opinion. Id. at *3 ("Unfortunately, because the definitions of the various classes proposed by Plaintiffs are not identical, any decision we make concerning whether Dr. Courchane's opinions 'fit' with the proposed class definitions is complicated by the fact that neither Dr. Ayers nor Dr. Courchane differentiate between the various class definitions when offering their opinions.")  We did not,

however, follow through on that observation and attempt to address our discussion of the MED issue to any specific class.

Plaintiffs now appear to concede that our discussion of the MED issue was overbroad. While insisting that we correctly determined the issue with regard to the <u>Cave II</u> class, (<u>see</u> Pl. Mem. at 5 (arguing that "the Cave II opinion leaves no room for doubt that the MED must be a deadline for Saxon's performance")), they do not make the same argument with regard to the <u>Cave I</u> Class. (<u>See</u> Pl. Mem. at 7 (arguing only that "Saxon ignores the fact that the timing of a notice of denial pertains only to members of the <u>Cave I</u> denied class who were not eligible for HAMP").)

We grant Saxon's Motion for Reconsideration in part to address this problem. Having previously stated that the <u>Cave I</u> breach of contract claim is probably dependent upon a breach of the implied covenant of good faith and fair dealing because the TPP contains no express provision stating when Saxon had to send a written denial, it was not proper to discuss the MED issue without excluding the <u>Cave I</u> Class. However, for the <u>Cave II</u> Class, which includes only borrowers who received countersigned TPPs, Saxon makes no cogent argument for reconsideration of Dr. Courchane's improper treatment of the MED. That Class is defined to include only borrowers who received a countersigned TPP. Saxon argues that the MED term contains a latent ambiguity, for which it may offer extrinsic evidence to ascertain its meaning. We cannot agree.

In Pennsylvania, the law governing the treatment of an alleged latent ambiguity "is somewhat complicated; while the broad principles are clear, it is not a seamless web." <u>Bohler-Uddeholm Am., Inc. v. Ellwood Grp., Inc.</u>, 247 F.3d 79, 92 (3d Cir. 2001). The Third Circuit has summarized the law of Pennsylvania as follows:

[A] contract that is unambiguous on its face must be interpreted according to the natural meaning of its terms, unless the contract contains a latent ambiguity, whereupon extrinsic evidence may be admitted to establish the correct interpretation. However, a claim of latent ambiguity must be based on a "contractual hook": the proffered extrinsic evidence must support an alternative meaning of a specific term or terms contained in the contract, rather than simply support a general claim that the parties meant something other than what the contract says on its face. In other words, the ambiguity inquiry must be about the parties' "linguistic reference" rather than about their expectations. . . . **Furthermore, a proffered alternative meaning for the contractual hook must be reasonable; that is, it must be supported by contractual evidence that goes beyond the party's claim that the contractual hook has a certain meaning, and the interpretation cannot contradict the standard meaning of a term when the parties could have easily used another term to convey this contradictory meaning.** In determining whether latent ambiguity exists in a facially unambiguous contract, a court must consider whether the extrinsic evidence that the proponent of the alternative interpretation seeks to offer is the type of evidence that could support a reasonable alternative interpretation of the contract, given the foregoing principles. Finally, a court can consider an alternative interpretation of a facially unambiguous contract term when the plain meaning interpretation of the contract would lead to an absurd and unreasonable outcome.

Id. at 96 (internal citation omitted; emphasis added). Saxon argues that it is permitted to offer extrinsic evidence of the meaning of the MED term because the claim of latent ambiguity is based on a "contractual hook": its proffered extrinsic evidence — the Treasury HAMP Dictionary — allegedly supports an alternative meaning of the MED term contained in the TPP.

We find that Saxon's proffered alternative meaning for the MED is simply not reasonable. Its interpretation would directly contradict the very specific language the parties used to determine the MED: "the first day of the month following the month in which the last Trial Period Payment is due (the 'Modification Effective Date')." (TPP ¶ 2.) There is nothing in the TPP to suggest that Saxon and the Plaintiffs assigned any definition to the MED other than the definition the contract contains. If the parties wanted to distinguish an "anticipated MED" from an "official MED" they "could have easily used another term to convey this contradictory meaning." Bohler-Uddeholm Am., Inc., at 96. Additionally, varying the MED finds no support

12

in the four corners of the contract and would lead the type of absurd and unreasonable outcome that we identified at oral argument when commenting on the implication of the <u>Cave II</u> ruling, the effect of the MED, and the manner in which Dr. Courchane's interpretation could affect the operation of the TPP and Saxon's obligation to make a permanent modification if it failed to issue a denial before the MED:

> Well, we're past denial, okay. . . .  I'm talking in terms of the time[] period that Saxon would have [to approve the permanent modification].  And what I understand from you, it goes on until the end of the mortgage.  15-year mortgage, it goes 15 years.  If, at any time during the course of that 15 years, it is determined that the original information that was submitted as part of this program, was inaccurate, then they can decline to proceed on the mortgage.

(N.T. Aug. 25, 2015 at 62-63.)

Because we previously held in the May 2013 Opinion that Saxon's countersigning the <u>Cave II</u> Plaintiff's TPP and returning it to the borrower formed a binding obligation so long as the two conditions precedent were satisfied, we held in the October Opinion that "it was incumbent upon Saxon under the terms of the signed TPP to issue a notice of denial within the time period specified."  October Opinion, at *5.  This conclusion follows inescapably from our prior holding that, for the <u>Cave II</u> Class, a permanent modification would otherwise "occur automatically upon the expiration of the three-month trial period."  May 2013 Opinion, at *7 (emphasis omitted) (quoting May 2012 Opinion at *5).  Since membership in the <u>Cave II</u> Class does not depend upon Saxon sending a notice of denial within a "reasonable" period of time, but rather upon an eligible borrower who has already received a countersigned TPP failing to receive a permanent modification by the MED set forth in their TPPs, we have no ground to reconsider the MED issue with regard to the <u>Cave II</u> Class.

b.      The Financial Documentation Issue

In her Report, Dr. Courchane criticizes Dr. Ayer's proposed methodology for ascertaining class members because he proposed no methodology to determine on a class-wide basis whether a borrower's documents were submitted, what the documents showed, and how the documents related to the verbal information the borrower had initially provided.  (See Courchane Report ¶¶ 49-50.)   We rejected this criticism, stating in the October Opinion that if a class member "failed to provide accurate information, was ineligible for a permanent modification, or the information submitted was delayed, deficient or ambiguous, it was incumbent upon Saxon under the terms of the signed TPP to issue a notice of denial within the time period specified." October Opinion, at *5.  We conclude that Saxon is correct that this statement is problematic because it fails to distinguish between the Cave I and Cave II Classes.  Specifically, it argues that the holding excuses Dr. Ayer's failure to account for two of the definitional elements of the Cave I Class.  (Saxon makes no argument that this impacts our Cave II holding.)

The Cave I Class is based on the lack of timely notice and includes the documentation requirement as one of its definitional elements.  Our statement that Dr. Courchane's criticism of Dr. Ayers failed the fit test should not have applied to Cave I; as no Cave I class member received a countersigned TPP indicating presumptive approval for a permanent modification if they complied with the Plan, and the claim involves a failure to give reasonably timely notice of denial, Plaintiffs have the burden under Federal Rule of Civil Procedure 23 to show by evidence that is common to the class that each prospective class member provided accurate and timely financial information.  Dr. Courchane's criticism of Dr. Ayers for allegedly failing to provide a method for establishing whether and when borrowers provided the documentation, does facially "fit" the Cave I Class, since satisfying the burden of complying with Saxon's requests for

14

documentation is part of that Class's definition.  Accordingly, we grant reconsideration in part to make this distinction.[1]

An appropriate Order will be entered.

BY THE COURT:

/s/ John R. Padova

_____

JOHN R. PADOVA, J.

---

[1]     Saxon requests that we certify our October Opinion for interlocutory review insofar as we decline to grant it reconsideration.  We decline the request.  Title 28 U.S.C. § 1292(b) allows a district court to certify an order for interlocutory appeal if it is of the opinion that:

> such order involves a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal from the order may materially advance the ultimate termination of the litigation.

Id.  Pursuant to this statute, "a non-final order may only be certified for interlocutory appeal if the court determines that it: (1) involves a 'controlling question of law;' (2) for which there is 'substantial ground for difference of opinion;' and (3) which may 'materially advance the ultimate termination of the litigation' if appealed immediately."  Knipe v. Smithkline Beecham, 583 F. Supp. 2d 553, 598 (E.D. Pa. 2008) (quoting Katz v. Carte Blanche Corp., 496 F.2d 747, 754 (3d Cir. 1974)).  If each of these elements are satisfied, the decision to certify an interlocutory order for appeal under § 1292(b) rests within the sound discretion of the trial court. Id. at 599.

The only part of the October Opinion for which Saxon seeks reconsideration and that remains undisturbed concerns the Cave II Class.  Saxon has not argued for interlocutory review insofar as the October Opinion relates to the Cave II Class.  It argues only that we have decided a controlling question of law for the Cave I Class.  (See Def. Mem. at 23 ("At least as to the Cave I Class, the Court's resolution of these issues . . . establishes controlling questions of law deserving of certification of an interlocutory appeal under § 1292(b).")  Although the face of Saxon's Motion — like everything else in the case — doesn't differentiate between the two classes, we have essentially granted it the relief it seeks, and accordingly, there is no basis for an interlocutory appeal.  If Saxon is unsuccessful on the question of whether a class should be certified, it will have the opportunity under Rule 23(f) to appeal the decision.