IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| LISA and SCOTT CAVE, on behalf of themselves and all others similarly situated,<br><br>       Plaintiffs,<br><br>  v.<br><br>SAXON MORTGAGE SERVICES, INC.,<br><br><br>       Defendant. | Civ. A. No. 11-4586 |
| WILLIAM D. CAVE, on behalf of himself and all others similarly situated,<br><br>       Plaintiffs,<br><br>  v.<br><br>SAXON MORTGAGE SERVICES, INC.,<br><br><br>       Defendant. | Civ. A. No. 12-5366 |

## MEMORANDUM

**Padova, J.**                                      **October11th, 2016**

## I.  INTRODUCTION

Plaintiffs Lisa and Scott Cave, and William D. Cave brought these class action suits against Defendant Saxon Mortgage Services, Inc. ("Saxon") alleging Saxon breached Trial Period Plan agreements ("TPP") entered into with thousands of distressed mortgage borrowers pursuant to the Home Affordable Modification Program ("HAMP"). Specifically, they allege that Saxon breached the TPP contracts when it failed to either: (1) offer a permanent HAMP modification by the Modification Effective Date ("MED") set forth in the TPP; or (2) provide a

timely written notice of denial.  Presently pending are Plaintiffs' motion to certify two classes, one class for each of these two civil actions.  After rigorous assessment of the class action record, we deny the motion.

## II.   PLAINTIFFS' CLAIMS AND THE MOTION FOR CLASS CERTIFICATION

The plaintiffs in Civil Action Number 11-4586 ("Cave I") are Lisa and Scott Cave.  The plaintiff in Civil Action Number 12-5366 ("Cave II") is William Cave.  Both cases contain class action allegations.  The claims contained in the current iterations of Plaintiffs' Complaints are: breach of contract/breach of duty of good faith and fair dealing (Count I), based on Saxon's "failing to offer Plaintiffs and members of the Class permanent HAMP modifications after they made the required TPP payments and submitted the required documentation" (Cave I Second Amended Complaint ("SAC") ¶ 85; Cave II SAC ¶ 115), promissory estoppel (Count II), asserting Saxon is estopped from denying that the TPPs were binding contracts (Cave I SAC ¶ 92; Cave II SAC ¶ 122), and violation of the Pennsylvania Unfair Trade Practices and Consumer Protection Law ("UTPCPL") (Count III), asserting Saxon engaged in unconscionable commercial practices.  In Cave I, Plaintiffs seek as relief a declaration that Saxon breached their TPP contracts and breached the covenant of good faith and fair dealing.  (Cave I SAC at 29.)  In Cave II, Plaintiffs seek similar declaratory relief and actual and statutory damages.  (Cave II SAC at 39.)

The proposed Cave I Class is defined by Plaintiffs as:

All Pennsylvania homeowners whose mortgage loans have been serviced by Saxon and who, since April 13, 2009, (i) entered into TPP Contracts with Saxon and made all payments as required by their TPP Contracts and complied with Saxon's requests for documentation, and (ii) did not receive a permanent Home Affordable Modification and did not receive timely written notifications explaining the reason for denying the permanent modification.

(Pl. Mem. at 4, Cave I SAC ¶ 66a.)  Plaintiffs seek to certify the Cave I class as an "issues class"

pursuant to Fed. R. Civ. P. 23(c)(4)[1], which provides that, "[w]hen appropriate, an action may be

brought or maintained as a class action with respect to particular issues."  The liability issues it

seeks to certify for class treatment are whether the TPP is an enforceable contract and whether

the MED contained therein is a deadline for Saxon to notify borrowers as to its determination of

their HAMP eligibility.  (Pl. Mem. at 4.)

The proposed Cave II Class, sought to be certified as a damages class under Fed. R. Civ.

P. 23(b)(2), is defined as:

> All borrowers in Arizona, Hawaii, Idaho, Illinois, Indiana, Maine, Massachusetts,
> Montana, Nevada, Oregon, Pennsylvania, Rhode Island, Washington, and
> Wisconsin, whose loans have been serviced by Saxon and who, during the period
> between April 2009 and October 2009: (i) entered into TPP Contracts with Saxon
> that are substantially similar to Plaintiff William Cave's TPP Contract and that
> Saxon counter-signed and returned to the borrowers, (ii) made all monthly
> payments as required by their respective TPP Contracts, (iii) and did not receive
> permanent Home Affordable Modifications by the Modification Effective Date
> set forth in their respective TPP Contracts.

> The Cave II Class does not include any borrowers as to whom, on or before the
> Modification Effective Date set forth in their respective TPP Contracts, Saxon
> determined: (1) That the borrower no longer resided in the property identified in
> the TPP Contracts (the "Property") as his or her principal residence; (2) That the
> Property had been condemned; (3) That there had been a change in the ownership
> of the Property since the borrower signed the Mortgage and the Note (the "Loan
> Documents"); (4) That the borrower failed to obtain credit counseling that Saxon
> required them to obtain; or (5) That the borrower paid off their mortgage loan.

> The determination as to the exclusions set forth in the preceding paragraph shall
> be made exclusively by reference to such data as Saxon collected, compiled
> and/or maintained in connection with its obligations under the HAMP program,

---

[1] Although their Complaint originally sought certification pursuant to Fed. R. Civ. P. 23(b)(3) for damages, and originally proposed three distinct classes, the Cave I Plaintiffs have abandoned the attempt to certify any other class in their certification motion and now seek to certify a liability-only issues class under Rule (c)(4).  (See Pl. Mem. at 27 ("With respect to the Cave I Class, Plaintiffs only seek certification of a liability class pursuant to Rule 23(c)(4)."); Pl. Reply at 29 (stating Saxon's arguments on the Cave I Class's "ascertainability" are flawed because the "Cave I Class is a liability-only class pursuant to Rule 23(c)(4).").)

including, but not limited to, so-called IR2 data, which Saxon reported to the U.S. Department of the Treasury.

(Pl. Mem. at 4, Cave II SAC ¶ 94a.)

## III.    STANDARD OF REVIEW

The United States Court of Appeals for the Third Circuit requires us to "rigorously assess" the available evidence to assure the prerequisites of Rule 23 are met and to "resolve factual disputes by a preponderance of the evidence and make findings that each Rule 23 requirement is met or is not met, having considered all relevant evidence and arguments presented by the parties." In re Hydrogen Peroxide Antitrust Litig., 552 F.3d 305, 320 (3d Cir. 2008). A plaintiff "must be prepared to prove that there are in fact sufficiently numerous parties, common questions of law or fact, etc." Wal-mart Stores, Inc. v. Dukes, 564 U.S. 338, 350 (2011) (emphasis omitted). "Failure to meet any of Rule 23(a) or 23(b)'s requirements precludes certification." Danvers Motor Co., Inc. v. Ford Motor Co., 543 F.3d 141, 147 (3d Cir. 2008). It is the plaintiff's burden to prove by a preponderance of the evidence each of the prerequisites under Rule 23(a), and that the class fits within the desired categories of class actions set forth in Rule 23(b). In re Hydrogen Peroxide Antitrust Litig., 552 F.3d at 307, 316 n. 14 (citation omitted); Carrera v. Bayer Corp., 727 F.3d 300, 306 (3d Cir. 2013) (stating a plaintiff must show class action prerequisites by a preponderance of the evidence); see Hayes v. Wal-Mart Stores, Inc., 725 F.3d 349, 354 (3d Cir. 2013) ("It is plaintiff's burden to show that a class action is a proper vehicle for this lawsuit"). Rigorous analysis will frequently "entail some overlap with the merits of the plaintiff's underlying claim. That cannot be helped. '[T]he class determination generally involves considerations that are enmeshed in the factual and legal issues comprising the plaintiff's cause of action.'" Dukes, 564 U.S. at 351 (alteration in original) (quoting General Tel. Co. of SW v. Falcon, 457 U.S. 147, 160 (1982)). The Third Circuit has also held that issue

4

certification under Rule 23(c)(4), like any other certification decision under Rule 23, "must be supported by rigorous analysis." Hohider v. United Parcel Serv., Inc., 574 F.3d 169, 201 (3d Cir. 2009).

Rule 23(a) requires that Plaintiffs meet four elements for class certification: (1) numerosity; (2) commonality; (3) typicality; and (4) adequacy of representation.   If the requirements of Rule 23(a) are met, Plaintiffs seeking to certify a damages class must satisfy additional requirements of predominance and superiority required by Rule 23(b)(3).

Where common questions cannot be shown to predominate, plaintiffs may resort to Rule 23(c)(4) to "isolate the common issues [] and proceed with class treatment of these particular issues." Valentino v. Carter-Wallace, Inc., 97 F.3d 1227, 1234 (9th Cir. 1996) (citing 7B C. Wright, A. Miller & M. Kane Federal Practice and Procedure § 1790. p. 276 (3d ed. 2005); 1 W. Rubenstein, Newberg on Class Actions, § 4:89 (5th Ed. 2012)).   Classes certified under Rule 23(c)(4) are referred to as "issue classes."   "The ability to certify issue classes accords the courts discretion to realize the advantages and efficiencies of classwide adjudication of common issues when there also exist individual issues that must be tried separately." Newberg on Class Actions § 4:89.  The Manual for Complex Litigation "provides a detailed explanation of the advantages and limitations of the rule while also flagging the two major concerns that it has raised:"

> Rule 23(c)(4)[] permits a class to be certified for specific issues or elements of claims raised in the litigation. Selectively used, this provision may enable a court to achieve the economies of class action treatment for a portion of a case, the rest of which may either not qualify under Rule 23(a) or may be unmanageable as a class action. . . .  Certification of an issues class is appropriate only if it permits fair presentation of the claims and defenses and materially advances the disposition of the litigation as a whole.  If the resolution of an issues class leaves a large number of issues requiring individual decisions, the certification may not meet this test. In product-liability cases, there is a split of authority as to whether questions relating to product defects should be certified in an issues class.
>
> An issues-class approach contemplates a bifurcated trial where the

common issues are tried first, followed by individual trials on questions such as proximate causation and damages. . . .  There is a split of authority on whether the Seventh Amendment is violated by asking different juries to decide separate elements of a single claim.

Before certifying an issues class under Rule 23(d), the judge should be satisfied that common questions are sufficiently separate from other issues and that a severed trial will not infringe any party's constitutional right to a jury trial and will permit all the parties fairly to present the claims and defenses.

Id. (quoting Manual for Complex Litigation, Fourth, § 21.24 (internal citations omitted)). "[S]pecific advantages of issue certification include conserving institutional resources by avoiding duplicative litigation, ensuring that similarly situated plaintiffs are treated similarly, and allowing for the advancement of claims that individual plaintiffs would lack the incentive or ability to bring."  Newberg on Class Actions § 4:90 (internal citations omitted).

Certification of particular issues under Rule 23(c)(4), however, is only proper if the other requirements of Rule 23(a) and (b) are first met.  Romero v. Allstate Ins. Co., 52 F. Supp. 3d 715, 724 (E.D. Pa. 2014) (citing 7A C. Wright, A. Miller, & R. Kane, Federal Practice & Procedure § 1790, at 590 (2005).  The Third Circuit has held that, when deciding whether to certify an issue class, the trial court should consider the following non-exclusive list of factors:

the type of claim(s) and issue(s) in question; the overall complexity of the case; the efficiencies to be gained by granting partial certification in light of realistic procedural alternatives; the substantive law underlying the claim(s), including any choice-of-law questions it may present and whether the substantive law separates the issue(s) from other issues concerning liability or remedy; the impact partial certification will have on the constitutional and statutory rights of both the class members and the defendant(s); the potential preclusive effect or lack thereof that resolution of the proposed issue class will have; the repercussions certification of an issue(s) class will have on the effectiveness and fairness of resolution of remaining issues; the impact individual proceedings may have upon one another, including whether remedies are indivisible such that granting or not granting relief to any claimant as a practical matter determines the claims of others; and the kind of evidence presented on the issue(s) certified and potentially presented on the remaining issues, including the risk subsequent triers of fact will need to reexamine evidence and findings from resolution of the common issue(s).

Gates v. Rohm and Haas Co., 655 F.3d 255, 273 (3d Cir. 2011) (the "Gates factors").  The Third Circuit has noted that the interplay between the requirements for class certification under Rule 23(a) and (b) and the recognition of issue classes under Rule 23(c)(4) "'is a difficult matter that has generated divergent interpretations among the courts.'"  Id. (quoting Hohider, 574 F.3d at 200 n. 25).  Nevertheless, "[c]ourts frequently use Rule 23(c)(4) to certify some elements of liability for class determination, while leaving other elements to individual adjudication." Carroll v. Stettler, Civ. A. No. 10-2262, 2011 WL 5008349, at *4 (E.D. Pa. Oct. 19, 2011) (citing Chiang v. Veneman, 385 F.3d 256, 267 (3d Cir. 2004)).  When certifying an issue class, the issues to be tried should be clearly enumerated.  Gates, 655 F.3d at 273 (citing Wachtel v. Guardian Life Ins. Co. of Am., 453 F.3d 179, 184-85 (3d Cir. 2006)).  Likewise, the district court should explain how the remaining issues will be resolved.  Id. (citing Principles of the Law of Aggregate Litigation §§ 2.02(e) (2010)).

## IV.   ASCERTAINABILITY OF THE CAVE II CLASS

"Class ascertainability is 'an essential prerequisite of a class action, at least with respect to actions under Rule 23(b)(3).'"  Carrera, 727 F.3d at 306 (quoting Marcus v. BMW of No. Am., LLC, 687 F.3d 583, 592-93 (3d Cir. 2012)); see also Byrd v. Aaron's Inc., 784 F.3d 154, 162 (3d Cir. 2015), as amended (Apr. 28, 2015) (stating "the ascertainability requirement as to a Rule 23(b)(3) class is grounded in the nature of the class-action device itself").  The ascertainability element "functions as a necessary prerequisite (or implicit requirement) because it allows a trial court effectively to evaluate the explicit requirements of Rule 23."  Byrd at 162. It is an independent inquiry, in addition to the Rule 23 requirements that "ensures that a proposed class will actually function as a class."  Id.

To satisfy the ascertainability prerequisite, which applies to the <u>Cave II</u> Class, Plaintiffs must show by a preponderance of the evidence that the class is "currently and readily ascertainable based on objective criteria," <u>Marcus</u>, 687 F.3d at 593, and we "must undertake a rigorous analysis of the evidence to determine if the standard is met." <u>Carrera</u>, 727 F.3d at 306. "[A]scertainability and a clear class definition allow potential class members to identify themselves for purposes of opting out of a class.  Second, it ensures that a defendant's rights are protected by the class action mechanism.  Third, it ensures that the parties can identify class members in a manner consistent with the efficiencies of a class action." <u>Id.</u>  Accordingly, we must "ensure that class members can be identified 'without extensive and individualized fact-finding or "mini-trials."'" <u>Id.</u> (quoting <u>Marcus</u>).  "[T]o satisfy ascertainability as it relates to proof of class membership, the plaintiff must demonstrate that his purported method for ascertaining class members is reliable, administratively feasible, and permits a defendant to challenge the evidence used to prove class membership." <u>Id.</u>

The Third Circuit recently reiterated the ascertainability inquiry stating:

The ascertainability inquiry is two-fold, requiring a plaintiff to show that: (1) the class is "defined with reference to objective criteria"; and (2) there is "a reliable and administratively feasible mechanism for determining whether putative class members fall within the class definition."  [<u>Hayes v. Wal-Mart Stores, Inc.</u>, 725 F.3d 349, 355 (3d Cir. 2013)] (citing <u>Marcus v. BMW of N. Am., LLC</u>, 687 F.3d 583, 593-94 (3d Cir. 2012)).  The ascertainability requirement consists of nothing more than these two inquiries.  And it does not mean that a plaintiff must be able to identify all class members at class certification — instead, a plaintiff need only show that "class members *can* be identified." <u>Carrera</u>, 727 F.3d at 308 n. 2 (emphasis added).  This preliminary analysis dovetails with, but is separate from, Rule 23(c)(1)(B)'s requirement that the class-certification order include "(1) a readily discernible, clear, and precise statement of the parameters defining the class or classes to be certified, and (2) a readily discernible, clear, and complete list of the claims, issues or defenses to be treated on a class basis." <u>Wachtel ex rel. Jesse v. Guardian Life Ins. Co. of Am.</u>, 453 F.3d 179, 187-88 (3d Cir. 2006).

Byrd, 784 F.3d at 163.  The Court added that "a party cannot merely provide assurances to the district court that it will later meet Rule 23's requirements. . . .  Nor may a party 'merely propose a method of ascertaining a class without any evidentiary support that the method will be successful.'"  Id. at 164 (quoting Carrera 727 F.3d at 306, 307, 311) (internal citation omitted).

Based on the Report of their expert, Dr. Ian Ayres, Plaintiffs argue that membership in the Cave II Class may be ascertained on the basis of electronic data maintained by Saxon.  (See Decl. of Eric Lechtzin in Support of Pls. Mot. for Class Certification ("Lechtzin Decl.") Ex. 28 (August 25, 2014 Class Certification Report of Prof. Ian Ayres ("Ayres Report") at ¶ 44 ("By applying common and generally-accepted methods to Saxon's electronic records, including those reported to Treasury pursuant to HAMP guidelines and those maintained on Saxon's internal databases, it is possible to identify each individual borrower who meets the criteria of the class allegations raised by Plaintiffs.").)  Plaintiffs rely on testimony of Saxon's Rule 30(b)(6) witness Ryan Knapp, who queried Saxon's electronic records in order to identify the members of the Cave I and Cave II Classes, and specifically identified such class members by Financial Asset ID numbers ("FAID"), which corresponds to their loan numbers, names, addresses, social security numbers, and all the other information and documents that are routinely found in loan servicing files.  (See Lechtzin Decl. Ex. 5 (deposition transcript of Ryan Knapp ("Knapp Tr.")) at 42:14-48:19).  Dr. Ayres opines how the identities of each member of the Cave II Class may be ascertained with refinements to Mr. Knapp's methodology, and how this can be done on an automated basis without requiring individualized loan file reviews.  (Ayres Report ¶¶ 60-74.[2])

---

[2] Specifically, Dr. Ayres opines that he can use Saxon's data by (1) identifying those borrowers located in a state included in a Class definition with a TPP during the relevant period; (2) of those, one would then identify borrowers who made TPP payments; (3) of those, one would then identify those who made TPP payments on time according to HAMP guidelines; (4) then one would identify the outcome of the borrower's TPP (i.e., was it given a timely approval,

He goes on to opine that Saxon's data may be used to determine whether required TPP payments were timely made (id. ¶¶ 65-69[3]), and to determine whether the trial outcome was timely.  (Id. ¶¶

---

a late approval, a timely denial, or no decision).  (Ayres Report ¶ 61.)  He opines that Saxon's Treasury data includes a property standardized state code field that contains the state in which the property is located; a borrower execution date field that represents the date on which the borrower signed the TPP; and a first trial payment due date field that represents the effective start of the trial period.  (Id. ¶ 62.)  Borrowers can be identified as having returned a signed TPP by the presence in the borrower execution date field.  (Id. ¶ 63.)  Dr. Ayres opines that, based on the Cave II Class definition, putative Class members must have received a countersigned TPP agreement.  He cites Saxon's Rule 30(b)(6) witness Kevin Smith's testimony that Saxon would countersign a borrower's TPP agreement once the TPP agreement was returned by the borrower and Saxon had posted the first trial payment.  (Id. ¶ 64.)  Ayres concedes, however, that no Saxon representative could testify to a specific date field indicating that Saxon countersigned a TPP.  Nonetheless, Ayres opines that Smith's testimony supports a conclusion that Saxon countersigned a TPP if it was returned by the borrower and the first trial payment was posted since both of these conditions are identified in the Treasury Data in the borrower execution date field and the first trial payment due date field.

[3] Dr. Ayres concedes that Treasury data does not include a specific field for the length of the trial period as written in a TPP, however, it does includes fields that can be used to infer the originally conceived length of the trial using the MED field.  He opines that in "nearly all of the loans in the Treasury Data produced to Plaintiffs (1,533 out of 1,547 loans), this field is three months after the date recorded in the first trial payment due date field.  (Ayres Report ¶ 66.)  He also concedes that there are a small number of loans with an MED field value that "is many more months" later than the date recorded in the first trial payment due date field, including some of more than a year.  (Id.)

Ayres also concedes that the "original MED for a given trial may be an earlier date than the one shown in the Treasury Data produced to Plaintiffs.  However, Mr. Knapp testified that Saxon maintains earlier data values for its database fields, and these data values could be retrieved through systematic database queries" and that "one could identify the original MED for a given trial. . . ."  (Id. ¶ 67.)  Importantly, we note that Ayres does not state in his report that he has actually performed this task in order to ascertain who could be a member of the classes.  At oral argument, however, counsel stated:

> Ayres didn't have all of the IR-2 data.  It hasn't been produced, at this point, such that we could do a search of the full universe of borrowers to determine who should be in, who should be out.  We had a subset of that, that had been screened by Saxon. . . .  We know that the classes are at least 1329.  The class members have been identified by internal identifiers, we don't have their names, because Saxon can't give us that under banking regulations, until we get an order from this Court. . . .  [Ayres] knows that the hundred-plus data points in IR-2 and Saxon's payment histories in its servicing database, allow — give him sufficient information to identify precisely who is in the classes.

70-74.[4])  Finally, Plaintiffs argue that  in "a virtually identical class action against Saxon, the

court stated that the ascertainability requirement was satisfied."  (Pl. Mem. at 29 (citing Gaudin

v. Saxon Mortg. Servs., Inc., 297 F.R.D. 417, 424 (N.D. Cal. 2013) ("It is administratively

feasible to ascertain whether individuals are members of the class."), *petition for permission to*

*appeal pursuant to Fed. R. Civ. P 23(f) denied*, Saxon Mortgage Services, Inc. v. Gaudin, Appeal

No. 13-80186, Dkt. #13 (9th Cir. Nov. 20, 2013).[5])

    Saxon responds that Plaintiffs have provided no method for determining:  (1) if a

borrower entered into a Trial Plan that was substantially similar to Plaintiff William Cave's TPP

Contract; (2) if and when a TPP was countersigned by Saxon and returned to a borrower; and (3)

---

(N.T. 9/14/16 at 16-17.)

    Ayres goes on to opine that Saxon's FiServ data may be used to determine whether trial plan payments were made on time and to identify a borrower as having made all required payments because "payment amounts in FiServ payment history can be matched to the TPP payments, payment due dates, and MED from the Treasury Data to identify which transactions correspond to TPP payments and whether those payments were made timely."  (Id. ¶ 68.)  He opines that "[o]ne could identify a borrower as having made all required timely payments if the sum of the borrower payments posted in FiServ between the Borrower Execution Date and the (original) MED summed to the total TPP payments required."  (Id.)

    [4] Dr. Ayres opines that determining the trial outcome, and thus who may be a member of the class, begins by excluding borrowers who received either a timely denial or a permanent modification.  He notes that Saxon's Rule 30(b)(6) witness Kevin Smith testified that Saxon did not issue any denials until March 2010; therefore, Ayres asserts, no borrower with a TPP during the relevant Cave II class period of April 2009 to October 2009 would have received a timely denial before the borrower's MED deadline.  (Ayres Report ¶ 72.)  Ayres concedes that Treasury issued several extensions to servicers in the second half of 2009 to allow borrowers more time to submit the required documentation.  (Id. ¶ 73.)  He acknowledges that Treasury's actions had the effect of extending trial plan periods to January 31, 2010, and Saxon participated in each of these extensions.  (Id.)  Ayres opines that, even if these extensions are deemed valid by the Court, borrowers affected by the extensions could be identified using Saxon data, since Saxon sent written notices to borrowers to inform them of the extensions.  (Id.)

    [5] The class certified in Gaudin was defined as "California borrowers who entered into HAMP TPPs with Saxon effective on or before October 1, 2009, and made at least three trial period payments, but did not receive HAMP loan modifications." Gaudin, 297 F.R.D. at 431.

whether a borrower met the HAMP eligibility criteria based on verified financial information.[6] Accordingly, Saxon contends, the Cave II Class is incapable of meeting the ascertainability test.

      a.      A substantially similar TPP

The Cave II class definition requires that a borrower must have entered into a TPP with Saxon between April 2009 and October 2009 that was "substantially similar to Plaintiff William Cave's TPP Contract" (i.e., the March 2009 version of the TPP). (Pl. Br. at 2.) Saxon asserts that this information cannot be ascertained without reviewing individual borrower files.

It asserts that there is no way to ascertain from Saxon's data sources the date on which a borrower entered (i.e., signed) a TPP, or which version of the TPP a borrower executed. It asserts that Dr. Ayres' claim that this information can be extracted from the HAMP data that Treasury required Saxon to periodically report to the Federal National Mortgage Association ("Fannie Mae") (see Ayres' Report at ¶ 63), namely the *BorrowerExecutionDate* field, does not necessarily record the date the borrower signed the TPP. Rather, Saxon asserts, Treasury allowed servicers to populate the *BorrowerExecutionDate* field with either the date the TPP was signed or the date the borrowers made their first payment. (See Courchane Report ¶ 73) (noting

---

[6] Although Saxon lists whether a borrower made all monthly payments as required by their respective TPP Contracts as an additional factor in the introduction to its argument on the ascertainability of the Cave II Class, it never actually discusses the issue in that portion of its brief. We note also that, in its original Brief, Saxon's last ascertainability argument for the Cave II Class focused on the MED term in the borrowers' TPPs. Relying on the Report of its expert Dr. Marsha Courchane (Def. Ex. 38, October 13, 2014 Expert Report of Marsh J. Courchane, Ph.D. ("Courchane Report") concerning the meaning of the MED term, which we later rejected on Daubert grounds, see Cave v. Saxon Mortg. Servs., Inc., Civ. A. No. 11-4586, 2015 WL 6153754 (E.D. Pa. Oct. 20, 2015) ("October Opinion"), reconsidered in part, Cave v. Saxon Mortg. Servs., Inc., Civ. A. No. 11-4586, 2016 WL 4203864 (E.D. Pa. March 4, 2016) ("March Opinion"), Saxon asserted that since the trial periods could vary in duration, the MED was not a fixed ascertainable date and, accordingly, determining the length of any given borrower's trial period would require a manual individualized inquiry. (Def. Mem. at 28-29.) In its subsequent Supplemental Memorandum filed after our Daubert decision, Saxon concedes that we excluded Dr. Courchane's discussion of the MED as to the Cave II Class. (Def. Supp. Mem. at 9.)

the HAMP data dictionary "defines the *BorrowerExecutionDate* field as 'the date that the borrower executed (signed) the trial documents *if available*. Otherwise it is the date of the first payment.'"). Saxon also asserts that it used more than one version of the TPP throughout the relevant period. Saxon notes, for example, the *BorrowerExecutionDate* for Lisa and Scott Cave is September 1, 2009 (the date their first trial payment was due), and not the date they signed the TPP (November 30, 2009), and that they executed the August version of the TPP, not the March version. Id. Accordingly, Saxon concludes, there is no reliable way to ascertain from available data whether a borrower executed a TPP between April 2009 and October 2009.

Plaintiffs point to the testimony of Saxon's Rule 30(b)(6) witness, Kevin Smith, who stated that from May 2009 to October 2009, there was no change in the TPP form that Saxon used. (Lechtzin Decl. Ex. 6 (deposition transcript of Kevin Smith ("Smith Tr.")) at 60:22-61:8.) They also point to a spreadsheet prepared by Ryan Knapp generated from Saxon's data showing all borrowers in one of the designated states, who were placed into a TPP, who made their first payments, who were denied a permanent modification, whose reason for denial was coded as any reason except defaulting on their trial payments, and whose properties were owner-occupied. (Ayres Report ¶ 61.) As noted, Dr. Ayres opines that the class can be ascertained by refining Knapp's methodology by adding the *BorrowerExecutionDate* field "that represents the date on which the borrower signed the TPP document, and a *FirstTrialPaymentDueDate* field, representing the effective start date for a trial modification." (Id. ¶ 62.) Plaintiffs add that Smith testified that it was Saxon's policy to countersign every TPP that a borrower returned if they made their first scheduled trial payment. (Smith Tr. at 64:15-66:18.) Plaintiffs contend that this makes identification of Cave II Class members administratively feasible. Alternatively, Plaintiffs argue that if this is not sufficient, since Saxon does not deny that it possesses all of the

13

TPPs it issued to all members of the Class, it is also administratively feasible to manually check the estimated 1,329 TPPs at issue to confirm that the version number on the bottom of the first page states "Mar.09" and that they are signed.  (Lechtzin Decl. Ex. 29 (Reply Report of Ian Ayres ("Ayres Reply Report") ¶ 26).)

We find that Plaintiffs are correct that this factor does not make the class unascertainable. There is no indefiniteness in determining which version of the TPP any given borrower executed. While Saxon points to the example of Lisa and Scott Cave as borrowers whose *BorrowerExecutionDate* is recorded as the date their first trial payment was due, and not the date they signed the TPP, this is a nonsequitur since they are not members of the Cave II Class — i.e., they did not sign the March version of the TPP that William Cave signed.  Further, Saxon does not present evidence that there are other putative members whose membership may be unascertainable due to this factor.

b.      A Saxon countersignature.

Saxon asserts that it does not maintain data indicating whether it returned to a borrower a countersigned TPP, and it would be improper to assume, as Dr. Ayres has done, that borrowers received countersigned TPPs based on Saxon's general policy to countersign TPPs once a borrower had signed the TPP and the first trial payment had been posted to the account.  We find this argument is unsupported by the record.  Dr. Ayres relied on Saxon's own Rule 30(b)(6) witness who admitted that Saxon's uniform practice was to countersign the Cave II TPPs after it received the borrower executed copy and the first trial payment.  (Smith Tr. at 64:15-65:9, 66:11-18.)  The record also shows that Saxon did not issue any denial letter until March 2010.  (Id. at 97:6-97:10, 154:1-14.)  Since Saxon stopped using the Cave II version of the TPP by October 2009, Plaintiffs assert that the MED for any such TPP would have been no later than February 1,

2010.  (Ayres Report ¶ 72.)  On this record, Plaintiffs have demonstrated that membership in the Class may be ascertained by examining the borrower execution and the first trial payment data in Saxon's records, since these are evidence that all such borrowers received a countersigned TPP.

        c.        Eligibility based on verified financial information.

Next, Saxon argues that whether any <u>Cave II</u> TPP applicant satisfied HAMP's eligibility criteria based on verified financial information cannot be ascertained.  It notes that we have held that Saxon was only obligated to provide Plaintiffs with permanent modifications as long as their "representations in Section 1 continue[d] to be true in all material respects," <u>Cave v. Saxon Mortg. Serv., Inc.</u>, Civ. A. No. 11-4586, 2012 WL 1957588, at *6 (E.D. Pa. May 30, 2012) ("<u>Cave I</u> May Opinion"), and that Section 1 of the TPP provides: "I am providing or already have provided documentation for all income that I receive" and "all documents and information I have provided to Lender pursuant to this Plan, including the documents and information regarding my eligibility for the program, are true and correct."  (Def. Exs. 1, 2 at §§ 1.D., 1.E.)  Thus, Saxon contends that because a borrower's receipt of a permanent modification is contingent upon a borrower supplying all required documentation and providing truthful financial information, there is no way to ascertain class membership without a manual individualized review of each borrower's loan file to see whether a borrower provided accurate "documentation for all income" that he or she received.  It adds that,

> What <u>is</u> discernable from the available data (but not addressed by Plaintiffs) is that some two-thirds of the population Plaintiffs would count in the putative class did not obtain permanent modifications because their requests were incomplete (indicating that they failed to submit required documents or other information), or were determined to be ineligible based on the submitted documents showing that the eligibility criteria were not satisfied.  <u>See</u> Ex. 47.  Together with the 27% of borrowers coded as unqualified on the basis of [application of the Net Present Value test to their financial information] or forbearance calculations run on their submissions, the only readily available evidence indicates that more than 93% of the supposed class is presumptively not qualified on the basis of verified financial

> data.  See id.  In light of the presumptive failure by most of the putative class to adequately document their verbal financials — particularly in light of Treasury's observation that a "majority" of borrowers across all servicers similarly had obtained Trial Period Plans on the basis of false verbal financials (Ex. 3 at 13, 23) — there is no support at all for ignoring these express requirements for documentation of reported income.

(Def. Mem. at 27 (emphasis in original).)  Accordingly, Saxon concludes that only through an individualized review of loan files can one potentially evaluate the borrowers' compliance with the "'documentation for all income' requirement that Plaintiffs advance as an essential element of their class definition."  (Def. Mem. at 27-28.)  Moreover, even assuming one were able to determine that all required documentation had been submitted, the contents of such documents must be reviewed and compared with the borrowers' earlier verbal representations to determine the truth and correctness of such representations.  (Id.)

> Plaintiffs respond that Saxon's argument
>
> misses the point.  If such borrowers failed to submit required financial documents, then this "should have resulted in a timely denial decision by Saxon, rather than Saxon stringing the borrower along through an indeterminate trial period."

(Pl. Reply Mem. at 35 (quoting Ayres Reply Report at ¶ 17.)  They contend that, having failed to issue denials by the MED dictated by the terms of the Cave II TPP, Saxon cannot now ask us to use its deficient evaluation process as a shield to defeat certification.

We reject Saxon's argument insofar as it relates to the ascertainability requirement.  The requirement that a borrower submit all requested documentation is only an element of membership in the Cave I Class.  Contrary to Saxon's assertion, the "documentation for all income" requirement is not "an essential element of [the Cave II] class definition"; it is a term contained in the TPP.  Membership in the Cave II Class requires only a countersigned TPP, the three payments, and failure to receive a permanent modification.  However, the dispute over verification of verbal information and its effect on eligibility for a permanent modification will

be revisited when we later rigorously analyze whether the <u>Cave II</u> Class has satisfied the Rule 23(b)(3) requirement that common issues predominate for an issues class.

Because Plaintiffs have established that the <u>Cave II</u> Class is defined with reference to objective criteria and there is a reliable and administratively feasible mechanism for determining whether putative class members fall within the class definition, we conclude that the Class is ascertainable.

## V.     COHESIVENESS OF THE <u>CAVE I</u> CLASS

While a Rule 23(b)(2) class need not meet the ascertainability requirements that apply to Rule 23(b)(3) classes, <u>see</u> <u>Shelton v. Bledsoe</u>, 775 F.3d 554, 563 (3d Cir. 2015) ("[A]scertainability is not a requirement for certification of a (b)(2) class seeking only injunctive and declaratory relief, such as the putative class here."), such a class must be sufficiently cohesive. <u>Barnes v. Am. Tobacco Co.</u>, 161 F.3d 127, 143 (3d. Cir. 1998) ("While 23(b)(2) class actions have no predominance or superiority requirements, it is well established that the class claims must be cohesive."). An injunctive relief class must also be properly defined. "A properly defined 'class' is one that: (1) meets the requirements of Rule 23(a); (2) is sufficiently cohesive under Rule 23(b)(2) and [the Third Circuit's] guidance in <u>Barnes</u>, 161 F.3d at 143; and (3) is capable of the type of description by a 'readily discernible, clear, and precise statement of the parameters defining the class,' as required by Rule 23(c)(l)(B) and [the Third Circuit's] discussion in <u>Wachtel</u>, 453 F.3d at 187." <u>Shelton</u>, 775 F.3d at 563.

The cohesiveness requirement protects two interests. The first interest is in protecting unnamed class members, who "are bound by the action without the opportunity to withdraw and may be prejudiced by a negative judgment in the class action." <u>Barnes</u>, 161 F.3d at 143. The cohesiveness requirement protects this interest by ensuring that "significant individual issues do

not pervade the entire action because it would be unjust to bind absent class members to a negative decision where the class representatives' claims present different individual issues than the claims of the absent members present." Id. (citations and quotation marks omitted).  The second interest is in ensuring that the litigation remains manageable.  If a class is not sufficiently cohesive, "the suit could become unmanageable and little value would be gained in proceeding as a class action if significant individual issues were to arise consistently." Id. (quotation marks, citations, and alterations omitted).

To satisfy the cohesiveness test, we must find that the "class's claims are common ones and that adjudication of the case will not devolve into consideration of myriad individual issues." Newberg on Class Actions § 4:34.  "In other words, Rule 23(b)(2) applies only when a single injunction or declaratory judgment would provide relief to each member of the class.  It does not authorize class certification when each individual class member would be entitled to a *different* injunction or declaratory judgment against the defendant." Dukes, 564 U.S. at 360 (emphasis in original).  The Third Circuit has held  that any "'disparate factual circumstances of class members' may prevent a class from being cohesive." Gates, 655 F.3d at 264 (citing Carter v. Butz, 479 F.2d 1084, 1089 (3d Cir. 1973).  We have the discretion to deny certification in the presence of disparate factual circumstances.  Geraghty v. U.S. Parole Comm'n, 719 F.2d 1199, 1205 (3d Cir. 1983).  "The key to the (b)(2) class is 'the indivisible nature of the injunctive or declaratory remedy warranted — the notion that the conduct is such that it can be enjoined or declared unlawful only as to all of the class members or as to none of them.'" Dukes, 564 U.S.

at 360 (quoting Nagareda, <u>The Preexisting Principle and the Structure of the Class Action</u>, 103 Colum. L. Rev. 149, 176 n. 110 (2003)).[7]

Having rigorously analyzed the class certification record, we conclude the <u>Cave I</u> Class fails to satisfy the cohesiveness requirement.  This Class, premised upon whether the borrower received a timely written notification explaining the reason for denying the permanent modification, cannot be cohesive given the myriad individual issues involved in determining whether Saxon's denial notice was timely.

Notably, Dr. Ayres has opined that identification of <u>Cave I</u> Class members "merely requires a determination of the length of the trial period, whether the borrowers made the required TPP payments on time, whether the loan modification was denied, and the timing of that denial relative to the MED."  (Pl. Reply Mem. at 30 (quoting Ayres Reply Report ¶ 12).) Ayres opines that "the MED, the timing of trial payments, and the length of the trial period can be reliably determined from the Treasury (IR2) data and FiServ data maintained by Saxon, and can be ascertained by simple query.  The **timing of the denial decision** can be determined by Saxon's Treasury IR2 data or images of letters sent to borrowers that are maintained electronically by Saxon."  (<u>Id.</u> (emphasis added; footnotes omitted).)  We find that Dr. Ayres'

---

[7] Discussion of the cohesiveness issue must begin with by noting that the <u>Cave I</u> Plaintiffs make no specific argument in their moving papers that their proposed class meets the test.  While they initially presented arguments that the Class was ascertainable (<u>see</u> Pl. Mem. at 29-30), after Saxon argued they failed to demonstrate ascertainability the Class objected that the test was inapplicable because they sought only to certify a Rule 23(b)(2) class for injunctive relief (<u>see</u> Pl. Reply Br. at 29).  At oral argument, Counsel agreed that the cohesiveness requirement applied to the <u>Cave I</u> Class, but also conceded that Dr. Ayres offered no opinion on cohesiveness.  (N.T. 9/14/16 at 5.)  Counsel argued that we may find the element based on rigorous analysis of the overall facts and circumstances, including that all members of the Class signed the same version of the TPP over a relatively short period of time and made at least three trial payments, which plaintiffs had earlier argued demonstrated ascertainability.  (<u>Id.</u> at 5-6.) Accordingly, we treat the ascertainability arguments presented on behalf of the <u>Cave I</u> Class as cohesiveness arguments.

assertion is highly problematic.  By definition, this method, which relies in part on "images of letters" sent to borrowers, is not a simple electronic query.  Rather, as we explain, the timeliness issue involves individual determinations for each prospective class member.

Plaintiffs' choice to define the Cave I Class to include those who did not receive a **timely** written notification of denial destroys class cohesion.  But this cannot be avoided; the definition directly correlates to the claim that the Class seeks to litigate against Saxon, namely, breach of an implied covenant of good faith and fair dealing, rather than breach of an express contractual provision.  We earlier held that the borrowers' TPP contracts contained no express provision stating when Saxon had to send the written denial.  Cave I May Opinion, 2012 WL 1957588, at *8 ("as the TPP contains no express provision stating when Saxon had to send a written denial, the implied covenant of good faith and fair dealing may ultimately be the only aspect of the TPP that Saxon breached").  Thus, the nature of the claim implies that a mathematical counting of days is insufficient since each borrowers' compliance with the TPP is itself an individual issue and a factor that must be considered in the underlying liability issue of the reasonable timeliness of Saxon's notice of denial.  Additionally, Dr. Ayres statement that ascertaining the Cave I Class members "merely requires a determination of the length of the trial period, whether the borrowers made the required TPP payments on time, whether the loan modification was denied, and the timing of that denial **relative to the MED**" (Ayres Reply Report ¶ 12 (emphasis added)), confuses the Cave I definition, which is based on lack of "timely" denials, with the Cave II definition, which specifically references the MED as an alleged deadline.  Because Plaintiffs' reliance on the timing of a denial "relative" to the MED is imprecise, and Saxon's alleged lack of good faith and fair dealing with respect to the Cave I Class is too individual to be determined

only with reference to evidence that is common to the class, Plaintiffs cannot satisfy the cohesiveness requirement.

The Class also lacks cohesion for a second reason.  The class definition requires that putative members "complied with Saxon's requests for documentation."  This also requires reviewing the contents of each borrower's loan file and thus raises myriad individual issues. Saxon asserts that none of its data sources are capable of being queried to make this determination, as Saxon was not required to maintain and did not maintain data that would indicate which documents were submitted, which were still missing, or the exact time when a borrower submitted all required documentation.  (Def. Mem. at 22 (citing Courchane Report ¶ 50 ("Dr. Ayres has provided no method for establishing whether and when borrowers provided the documentation required by Treasury to evaluate their request for a loan modification and has provided no method for establishing whether Saxon failed to notify borrowers of documentation deficiencies on a timely basis and in accordance with HAMP guidelines or other requirements. Such determinations would require examination and evaluation of loan file documentation.").) Moreover, Saxon notes that this inquiry is further complicated by the fact that Treasury repeatedly "changed the standards for what documents are required and whether trial modifications can be entered into before such documentation is provided since the program was rolled out." (Def. Ex. 3 (March 25, 2010 Report of the Special Inspector General for the Troubled Asset Relief Program, "Factors Affecting Implementation of the Home Affordable Modification Program") at 21 (noting changes during the class period).)  Accordingly, Saxon concludes that "determining whether a borrower provided the requisite correct documentation would require comparing the contents of each borrower's individual loan file with the Treasury guidelines in place during that borrower's trial period, and further comparing the information

21

reflected on such documents with the information verbally provided by the borrower at the time the Trial Plan was issued."  (Def. Mem. at 22.)  We agree.

Plaintiffs' decision to define the <u>Cave I</u> Class as those who did not receive a timely written notification of denial clearly implicates each borrowers' compliance with the TPP, as well as Saxon's reasons for allegedly delaying the issuance of a denial, since the borrowers' diligence in submitting documentation to support their verbal information impacts the time in which a borrower would reasonably expect to receive an eligibility determination.  For example, since the class definition requires compliance with all of Saxon's documentation requests, those prospective class member who "complied," but delayed their compliance until part or all of the trial plan period had lapsed, would have a different expectation of when Saxon would act on their requests for permanent modifications from those who complied immediately.  Because the <u>Cave I</u> Class is (1) based on the reasonableness of the timing of Saxon's denial decision, and (2) a denial decision is based upon each putative class member's compliance with Saxon's requests for documentation, the underlying claim is too individually focused to permit Plaintiffs to satisfy the cohesiveness requirement.

Finally, Plaintiffs fail to clear a third hurdle standing in the way of cohesion:  the definitional element requiring that each prospective class member timely make the required trial period payments.  This requirement stems from the language of the Trial Period Plan, which requires at least three separate **and** timely payments.  (<u>See</u> Def. Exs. 1, 2 at § 2 ("On or before **each** of the following due dates, I will pay the Lender the amount set forth below . . . .") (emphasis added).)  The TPP explicitly warns borrowers that "TIME IS OF THE ESSENCE under this Plan.  This means I must make all payments on or before the days that they are due." (Def. Ex. 2 at § 2.)

Saxon asserts that determining whether a borrower made timely trial period payments requires reviewing "inherently complicated" payment histories.  (See Courchane Report ¶ 65 ("Dr. Ayres also oversimplifies the process needed to identify if payments are timely.  Loan payment history data is inherently complicated, and Dr. Ayres has not provided a method for identifying whether timely trial payments were made that accounts for the complications inherent in that data.").)  Saxon concedes that the data can determine the gross number of payments made over any given period of time, but objects that the data relied upon by Dr. Ayres cannot answer whether the payments "married up to the specific trial plans that were due and the amounts that would have been necessary to satisfy the trial payments."  (See Knapp Tr. at 21:9-14 ("We could determine gross number of payments made over a period of time, but whether or not those married up to the specific trial plans that were due and the amounts that would have been necessary to satisfy the trial payments, that isn't queriable and that would require a manual review."); Courchane Report ¶¶ 65-66 (opining that "unrelated payments received during trial plans [such as to cure pre-trial plan delinquencies] confound attempts to systematically query the payment history data in the manner suggested by Dr. Ayres. . . .  Dr. Ayres assumes that trial payments were made at precisely the TPP amounts, and that the payment histories reflect those payments independently of other credits or debits made at the same time, such as escrow payments.  While the payment histories do reflect borrower payments, neither of Dr. Ayres' assumptions are likely to be true for putative class members and is not true for the named Plaintiffs").)  Saxon contends that, unable to formulate any method for determining this element on a class basis, "Plaintiffs instead choose to ignore the Trial Plan's requirement that each separate trial payment be timely.  Plaintiffs instead propose 'identify[ing] a borrower as having made all required payments timely if the **sum** of the borrower's payments [between two dates]

summed to the total TPP payments required.'"  (Def. Mem. at 23 (quoting Ayres Report ¶ 68) (emphasis added in Def. Mem.).)  Saxon argues that this can improperly include borrowers who failed to make each trial payment in full and on time as compliant with the putative class definition, when they plainly are not.

As an example, Dr. Courchane cites the payment history of Lisa and Scott Cave, the <u>Cave I</u> class representatives.  Their payment history shows that a payment in the amount of $3,600 was posted as received on August 4, 2009, the same day their trial plan was approved.  However, the Loan Servicing Notes History for their loan for this date (and for July 24, 2009) suggest that the $3,600 payment was an attempt to catch up on delinquent amounts owed by the Caves, rather than intended to be an advance payment of the three trial payments.  Courchane notes that, before the Caves were approved for a trial plan, the Loan Servicing Notes History recorded the following regarding Scott Cave

> CLLD TO LET US KNOW THAT HE WILL MKE APRIL AND MAY PMTS BFRE JULY 31ST, PMT IAO $3868.44, OFFERED WUPP, WILL SEND WESTERN UNION, WILL MKE JUNE AND JULY PMTS IN AUGUST, SO HE WILL BE CAUGHT UP BY SEPT.

(Courchane Report ¶ 67 (quoting Loan Servicing Notes History for Lisa and Scott Cave).)  Dr. Courchane notes that the Caves actually made no payment until the $3,600 was received on August 4, 2009, and that the amount bears no direct relationship to the amount of the monthly trial plan payments recorded in their TPP (i.e., it is not a multiple of the listed payment).  (<u>Id.</u>)  In fact, she notes, the payment was made before the Caves had any discussion with Saxon about HAMP or a TPP.  Dr. Courchane opines that Dr. Ayres "ignores all of this evidence in treating the $3,600 as though it had been paid toward the obligatory payments of the trial plan."  (<u>Id.</u>)  Further, she asserts that this history shows that "Saxon's decision to apply the Caves' payment to amounts due under the TPP only demonstrates that payment history records alone will not enable

one to reach a definite conclusion about which payments counted toward a trial plan and which did not.  Rather the Loan Servicing Notes History and the loan documents, which vary by borrower, must be cross-referenced."  (Id.)

Dr. Ayres rejects this criticism that he "oversimplified the process needed to identify if payments are timely."  (Ayres Reply Report ¶ 27.)  Rather, he asserts, the

> determination of whether a borrower made all their trial payments in a timely manner is a simple formula.  A borrower did not make timely trial payments and is therefore non-compliant with the TPP if the total payments made on or after the Borrower Execution Date (or First Trial Payment Posted Date, if that date is earlier) and before the MED is less than the aggregate TPP payment amount due. . . .  On the other hand, a borrower was compliant with the payment provisions of the TPP and made timely TPP payments if the total payments made on or after the Borrower Execution Date and before the MED is greater than or equal to the aggregate TPP payment amount due.

(Id. ¶ 28.)  He rejects the Lisa and Scott Cave example cited by Dr. Courchane as a complicating factor to determining whether trial payments were timely, noting,

> the fact that each payment made by these borrowers during their respective trial periods was not precisely equal to the amount due stated in their TPPs is irrelevant.  So long as the aggregate amount paid is at least as much as the aggregate TPP payments due, then the borrower is compliant with the timely payment provisions of the TPP.  The payment histories of Lisa and Scott Cave and of William Cave, as shown in my original report and in Dr. Courchane's report, show that these borrowers paid amounts during their trial period that exceeded the aggregate TPP payment amount due. . . .  [Courchane's information about the Caves' intentions, as recorded in their Loan Servicing Notes History] is not relevant for purposes of determining whether they made timely trial payments.  If the payments of the sufficient amount were made during the relevant period (on or after the Borrower Execution Date or First Payment Posted Date but before the MED), then those payments should be (and indeed were, as demonstrated by Saxon's classification of payments made by the named Plaintiffs) considered to be trial payments.

(Ayres Reply Report ¶ 30.)

We find that Dr. Ayres' response to Dr. Courchane is entirely inadequate.  Rather than address her criticism — and her example using the named Plaintiffs' own payment history — he

asks us to ignore it because he has ignored it.  It is not, as he suggests, irrelevant to our rigorous analysis.  The Cave I Class definition requires that borrowers made all payments as required by their TPPs.  Whether a borrower intended a payment to be credited toward their TPP obligation, or for some other purpose, is clearly relevant to whether they satisfied their payment obligations under the TPP.  Dr. Ayres, we find, too easily dismisses borrowers whose payments were not precisely equal to the amount due stated in their TPPs.  The record shows that Lisa and Scott Cave were suffering financial distress before they signed their TPP.  Moreover, their stated purpose in making a lump sum payment — before their trial period even began — to "BE CAUGHT UP BY SEPT" is clearly relevant to whether they believed the payment was or was not intended to be their TPP payments.  Since the record shows that a Cave I Class member's payment history is not merely a question of crediting any payment to their accounts as a trial period payment, this is further reason why Plaintiffs cannot show the class is cohesive.

Accordingly, we conclude that the Cave I Class cannot be certified because it is not cohesive.[8]  For purposes of providing a complete record of decision, we will also address the other Rule 23 requirements for the Cave I Class.

---

[8]  This finding applies to both the claim for breach of implied duty of good faith and fair dealing as well as the Class's UTPCPL claim.

In their opening Brief, Plaintiffs argue that the Cave I Class's claim for violation of the UTPCPL "focus squarely on Saxon's uniform conduct as opposed to personal characteristics of the individual Cave I Class members."  (Pl. Mem. at 39.)  Plaintiffs claim that they can meet their certification burden because every member of the Cave I Class received the same version of the TPP form, and Saxon had the same obligation to each member to provide timely notification of denial "by reference to the MED."  (Pl. Reply Mem. at 55.)  They argue that Saxon's own data can be presented in summary format at trial to show that each Cave I member did not receive a written denial by the MED or by a common later point in time, continued to make trial payments, and was never offered a permanent modification.  In the alternative, if proof of reliance by each member is required, Plaintiffs argue that the fact that each member made more than the three required trial payments is evidence they believed that, by doing so, Saxon would approve the permanent modification.

## VI.     THE RULE 23(a) REQUIREMENTS

### a.     Numerosity

Under Rule 23(a), a plaintiff bears the burden of establishing numerosity by a preponderance of the evidence.  <u>Marcus</u>, 687 F.3d at 594-95.  Plaintiff must prove that the putative class is "so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1).  "No minimum number of plaintiffs is required to maintain a suit as a class action, but generally if the named plaintiff demonstrates that the potential number of plaintiffs exceeds 40, the first prong of Rule 23(a) has been met."  <u>Stewart v. Abraham</u>, 275 F.3d 220, 226-27 (3d Cir. 2001) (citing 5 James Wm. Moore et al., Moore's Federal Practice § 23.22[3][a] (Matthew Bender 3d ed. 1999)).  We cannot "assume," "speculate," or defer to "common sense" with

---

We have already held that the <u>Cave I</u> Class's claim under the UTPCPL "catchall" provision bars engaging in "fraudulent or deceptive conduct which creates a likelihood of confusion or of misunderstanding" in the conduct of trade or commerce.  <u>Cave I</u> May Opinion, 2012 WL 1957588, at *9 (citing 73 Pa. Stat. Ann. § 201-2(4)(xxi); <u>Toy v. Metro. Life Ins. Co.</u>, 928 A.2d 186, 190 n. 4 (Pa. 2007).  We held that to state a claim under the UTPCPL, a plaintiff must allege that he "'justifiably relied on the defendant's wrongful conduct or representation and that he suffered harm as a result of the reliance.'"  <u>Id.</u> (quoting <u>Molley v. Five Town Chrysler, Inc.</u>, Civ. A. No. 07–5415, 2009 WL 440292, at *2 (E.D. Pa. Feb.18, 2009) (quoting <u>Hunt v. U.S. Tobacco Co.</u>, 538 F.3d 217, 222 (3d Cir. 2008))).  We added in the <u>Cave II</u> May Opinion that a complaint "must allege that knowledge of the deceptive conduct 'would have changed [Plaintiffs'] conduct.'"  <u>Id.</u> (quoting <u>Hunt</u>, 538 F.3d at 227).

We find that Plaintiffs have failed to meet their certification burden with respect to the UTPCPL claim as well.  The same issue that prevents Lisa and Scott Cave from certifying their breach of duty of good faith and fair dealing claim — cohesiveness — also prevents certification of the UTPCPL claim.  Similar to that claim, the Plaintiffs' focus on "timely notification of denial by reference to the MED" to show a UTPCPL violation necessitates individual issues of proof on timeliness, documentation, and payment histories.  Each of these factors is relevant to whether Saxon's actions with regard to each class member created a likelihood of confusion or misunderstanding about their receipt of a permanent modification.  These factors are also relevant to the reliance element and how the alleged deceptive conduct would have changed Plaintiffs' conduct.  Accordingly, we find that Plaintiffs have also failed to show cohesiveness for this claim.

Finally, the reasons we find that the Class lacks cohesiveness also control the <u>Gates</u> factors used to determine whether to certify an issues class.  The individualized nature of the type of claims and issues involved, and the overall complexity they bring to the case, overwhelm any efficiencies that might be gained by granting partial certification.

respect to how many class members exist.  Marcus, 687 F.3d at 595-97.  The plaintiff must produce evidence, direct or circumstantial, specific to the products, problems, parties, and geographic areas actually covered by the proposed class definitions to allow us to make a factual finding on this requirement.  Id. at 596.

Dr. Ayres opines based on Saxon data that the Cave II Class consists of at least 1,329 loans and the Cave I Class consists of 37 loans.[9]  (Ayres Report ¶ 59.)  Saxon makes no argument on this issue.  We find that Plaintiffs proposed classes are sufficiently numerous.

b.      Commonality

"A putative class satisfies Rule 23(a)'s commonality requirement if 'the named plaintiffs share at least one question of fact or law with the grievances of the prospective class.'"  Reyes v. Netdeposit, LLC, 802 F.3d 469, 486 (3d Cri. 2015) (citing Rodriguez v. Nat'l City Bank, 726 F.3d 372, 382 (3d Cir. 2013)).  "Commonality does not require perfect identity of questions of law or fact among all class members.  Rather, even a single common question will do."  Id., 802 F.3d at 486 (citing Dukes, 564 U.S. at 359).   The commonality inquiry turns on whether determining the truth or falsity of a common contention will resolve an issue that is central to the validity of each one of the claims in one stroke.  Id. at 486.  "What matters to class certification . . . is not the raising of common questions — even in droves — but, rather the capacity of a classwide proceeding to generate common *answers* apt to drive the resolution of the litigation."  Dukes, 564 U.S. at 350 (emphasis and ellipsis in the original).   The bar for establishing commonality is "not high" and is "easily met."   In re Cmty. Bank of N. Va. Mortg. Lending

_____

[9] The parties refer to the number of loans, rather than the number of borrowers, because some loans have multiple borrowers.  We accept for purposes of the numerosity issue that each loan represents at least one prospective class member.

Practices Litig., 795 F.3d 380, 397 (3d Cir. 2015); Reyes, 802 F.3d at 486 (citing Baby Neal v.

Casey, 43 F.3d 48, 56 (3d Cir. 1994)).[10]

     Plaintiffs argue that Rule 23(a) commonality is satisfied because everyone in the

respective classes entered into the same standard TPP form with Saxon, made at least three trial

payments called for therein, and did not obtain a permanent loan modification.  (Pl. Mem. at 31.)

They point to evidence from Saxon's Rule 30(b)(6) witness, who testified that "there was not a

change to the TPP" Saxon used between May 2009 and October 2009 (i.e., the Cave II TPP), and

that the form of TPP "would not differ by where the property was located."  (Smith Tr. at 60-61.)

Saxon's corporate designee also stated that Saxon used the Cave I TPP form nationwide between

October 2009 and May 2010.  (Id. at 69-70.)  Plaintiffs also rely on Dr. Ayres' opinion that the

same data used to identify the members of the Classes may be used on a class-wide basis to

establish whether or not there is a breach of the TPPs.   (Ayres Report ¶¶ 75-78.)

     Saxon disputes that there are common questions.  It argues that whether everyone in the

respective Classes entered into the same standard form TPP, made the three trial payments, and

did not obtain a loan modification are "not the questions that Plaintiffs set out as defining the

respective classes or their rights, and therefore not the questions that 'drive the litigation.'"  (Def.

Mem. at 31 (quoting Alberton v. Commonwealth Land Title Ins. Co., 299 F.R.D. 109, 114 (E.D.

Pa. 2014) quoting Dukes, 564 U.S. at 350).)  Specifically, for the Cave I class, Saxon asserts that

the Plaintiffs have not demonstrated that the class members suffered the same injury, and have

---

[10] Where the class is proposed to be certified under Rule 23(b)(3), district courts typically analyze Rule 23(a)'s commonality requirement together with the more stringent predominance requirement of Rule 23(b)(3).  Reyes, 802 F.3d at 486; see Sullivan v. DB Investments, Inc., 667 F.3d 273, 297 (3d Cir. 2011).  The Third Circuit, however, recently cautioned that commonality must be established *before* predominance can be considered.  Reyes, 802 F.3d at 486 (emphasis in original).

not demonstrated that the claims are capable of class-wide resolution because that class, as defined,

> purports to include borrowers who suffered one of two distinct injuries: (a) not receiving a permanent HAMP modification despite qualifying for one — a class that could never be represented by Lisa and Scott Cave, as they do not allege that they qualified for modification, or (b) not receiving "timely written denial" — which the Court already has interpreted as an inquiry into Saxon's diligence with respect to any given borrower's application.  Neither of these claims is capable of class treatment.  Every borrower in the class under Plaintiffs' definition was necessarily denied a HAMP modification.  Determining whether a borrower was entitled to a permanent HAMP modification requires an individualized eligibility determination, which would necessarily require a comprehensive review of a borrower's loan file.  This conclusion is all the more apparent where the record is uncontroverted that some 95% of borrowers identified in discovery were in fact coded as not eligible. . . .  Any basis to refute such data would necessarily come from the individual loan files themselves.

(Def. Mem. at 30-31.)   Saxon argues that because receiving a "timely" written denial is definitional, liability would depend on the particular circumstances of each individual borrower and would require a similar individualized inquiry.  It adds that neither Plaintiffs nor Dr. Ayres explain how these determinations could be made on a class basis.

Saxon also rejects that there is commonality with respect to the putative Cave II class, because, even though they received a counter-signed TPP, the borrowers' obligations under the TPP were not limited to making three timely trial payments; borrowers also had to provide required documents and certify that all documents and information they provided are true, were true, and remain true.  (Id. at 32.)  Whether each borrower did so, Saxon asserts, is an individual inquiry for each purported class member and thus commonality is lacking.  For example, Saxon notes that borrowers who failed to return the required documents or whose documents failed to substantiate their representations necessarily failed to perform under the Trial Plan and thus lack a viable claim, even under Plaintiffs' theory.  Plaintiffs have the burden of proving that these obligations have been performed in each case; they cannot conveniently ignore them and claim

30

that the only relevant inquiry is whether a borrower made three trial period payments (particularly where Plaintiffs assert only that borrowers made payments totaling the sum of three trial period payments, but not necessarily in full, and on time, as required by the express terms of the Trial Plan).  (Id.)

We find that Saxon's arguments with regard to the Cave II Class, which it essentially repeats later in asserting that common issues do not predominate, are misdirected as to whether common questions of law or fact exist under Rule 23(a).  Whether or not the issues predominate, there are common questions concerning (1) the nature and scope of the TPPs, (2) whether they are enforceable contracts, and (3) whether Saxon breached the TPPs by failing to grant those who received a counter-signed TPP a permanent modification or issue a denial by the borrower's MED.  Because the correct interpretation of the TPPs is central to the validity of each class member's claims, and can be resolved for each class member in a single decision, we find that common questions of law and fact do exist for the Cave II Class.

For the Cave I Class, however, the same analysis that bars a finding that the class is cohesive, also bars a finding that there are common questions.  Whether each class member complied with the TPP and whether Saxon's written notice of denial was reasonably timely under the circumstances are not common questions.  Each borrowers' individual dealings with Saxon during the course of the modification process impacts the determination as to whether Saxon acted in good faith in the timing of its denial decision, or whether it violated the UTPCPL. The mere fact that all prospective class members signed the same contract does not "drive the resolution of the litigation."  Dukes, 564 U.S. at 350.

c.        Typicality

The typicality requirement aids a court in determining whether maintenance of a class action is economical and whether the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence.  Marcus, 687 F.3d at 597-98 (citing Gen. Tel. Co. of the Sw., 457 U.S. at 158 n. 13). Typicality "screen [s] out class actions in which the legal or factual position of the representatives is markedly different from that of other members of the class even though common issues of law or fact are present."   Id. at 598 (citing 7A C. Wright, A. Miller, & R. Kane, Federal Practice & Procedure § 1790, at 590).  To determine whether a plaintiff's position is markedly different from the class as a whole, we compare three distinct, though related, concerns: (1) the claims of the class representative must be generally the same as those of the class in terms of both (a) the legal theory advanced and (b) the factual circumstances underlying that theory; (2) the class representative must not be subject to a defense that is both inapplicable to many members of the class and likely to become a major focus of the litigation; and (3) the interests and incentives of the representative must be sufficiently aligned with those of the class. Marcus, 687 F.3d at 598-99.

Plaintiffs assert that the typicality requirement is satisfied because Plaintiffs Lisa and Scott Cave entered into and performed in accordance with the same TPP form as every other member of the Cave I Class, and brought the same legal claims for breach of contract, breach of the duty of good faith and fair dealing, and for violations of the UTPCPL that they could bring. Likewise, Plaintiff William Cave entered into and performed in accordance with the provisions of the same form TPP as every member of the Cave II Class, and brought the same legal claims for breach of contract.  (Pl. Mem. at 33.)

Saxon disputes that any named representative is typical.  It asserts that Lisa and Scott Cave are not typical of the proposed Cave I Class, because, contrary to their contention, they cannot "bring the same claims" as may be brought by the other class members.  Saxon notes that Lisa Cave conceded in her deposition that the two did not qualify for the permanent modification they sought. (Lechtzin Decl. Ex. 2 (deposition transcript of Lisa Cave ("L. Cave Tr.") at 44:3-9 (Q.  As you sit here today, you understand that irrespective of the timing of the notice, that, in fact, your application did not qualify under HAMP for a permanent modification? . . .  THE WITNESS:  Yes.).)  The  plaintiffs also acknowledged that qualification is an express condition precedent to any contract claim for modification, and that accordingly they can bring no such claim.  (Lechtzin Decl. Ex. 3 (deposition transcript of S. Cave ("S. Cave Tr.") at 286:12-17; L. Cave Tr. at 43:15-24, 158:25-159:16.)   For that reason, Saxon contends that they cannot represent a class of borrowers who claim that Saxon breached the Trial Plan by failing to provide permanent HAMP modifications.  (Def. Mem. at 33.)

Second, Saxon argues that Lisa and Scott Caves' breach of contract claim is subject to a unique defense — the Caves do not allege that Saxon ever signed and returned their TPP.  (L. Cave Tr. at 611:18-613:25; S. Cave Tr. at 503:6-504:4.)  The TPP explicitly states that it "will not take effect unless and until both I and the Lender sign it and the Lender provides me with a copy of this Plan with the Lender's signature."  (Def. Ex. 2.)  Because the TPP was never fully executed and returned to the Caves, Saxon contends that, by its own terms, it never went into effect, and the Caves' claim for breach of that unenforceable contract must fail.  (Def. Mem. at 33 (citing Mwantembe v. TD Bank, N.A., 268 F.R.D. 548, 557 (E.D. Pa. July 29, 2010) (finding plaintiffs failed to meet the typicality requirement where the factual circumstances did not support plaintiffs' legal theory)).)

We find that these arguments have no merit.  Lisa and Scott's claims and the <u>Cave I</u>

Class's claims are that Saxon breached their TPPs when it failed to provide them with written

denial notices within a timely period.   Whether or not they qualified for a permanent

modification or received a countersigned TPP is not an element of their claims.  We held in our

<u>Cave I</u> May Opinion denying Saxon's Motion to Dismiss the Plaintiffs' complaint that the TPP

was an enforceable contact, and "[u]nder its plain terms, the [<u>Cave I</u>] TPP obligated Saxon to

provide Plaintiffs a written denial if they did not qualify."   <u>Cave I</u> May Opinion, 2012 WL

1957588, at *7.  Because they claim they did not receive a timely denial, Lisa and Scott Caves'

claims are typical of the <u>Cave I</u> Class' claims.

Saxon asserts that William Cave is not typical of the <u>Cave II</u> proposed class, because it is

undisputed that he did not qualify for the permanent modification he sought.  Saxon notes that it

informed Mr. Cave on March 2, 2010 — which was after his MED — that he did not qualify for

HAMP on account of insufficient income.  (Def. Ex. 32.)  Mr. Cave asked Saxon to reevaluate

his HAMP application on March 15, 2010, taking into account his wife's income, even though

she was not a borrower on the Mortgage or Note and did not regularly contribute to the mortgage

payments.  (Def. Ex. 34; Lechtzin Decl. Ex. 4  (deposition transcript of Wm. Cave ("Wm. Cave

Tr.") at 47:4-7, 54:21-24.)  Cave subsequently submitted financial documentation for his wife on

March 15, 25, and 27, 2010, and in the March 25 and 27 submissions told Saxon that he would

submit his 2009 tax information shortly, which Treasury required for the HAMP eligibility

determination.  (Def. Exs. 29, 34-36.)  Saxon contends that there is no evidence that Cave ever

submitted his 2009 Form W-2 before the servicing of his loan by Saxon ended, and Cave does

not allege or prove otherwise.  Accordingly, Saxon concludes that Cave is not typical of a class

of borrowers who were denied even though they qualified under the program because he was not

denied modification, and he never qualified for the program because he never substantiated his supposed eligibility with the required documentation while the loan was serviced by Saxon. (Def. Mem. at 34.)

Second, Saxon asserts that William Cave is also subject to the unique defense that he is not eligible for the permanent HAMP modification sought because he orally overstated his monthly income when applying for permanent modification, and Saxon ultimately determined, based on his verified financials, that he did not meet HAMP's eligibility requirements.  (Def. Mem. at 33-34; Def. Ex. 9 (disclosing a negative net income).)  Saxon contends that it was prohibited under its Servicer Participation Agreement with Treasury from providing Cave with a permanent HAMP modification.  (See Def. Ex. 5 at § 6.A.(1) ("[Servicer must] "ensure that all eligibility criteria and other conditions precedent to modification specified in the Program Documentation are satisfied prior to effectuating modifications under the Program.").)  Saxon concludes that where, as here, "'the dispute over the eligibility of the named plaintiff[] to participate in the class plausibly threatens to engulf the Complaint,' typicality is absent."  (Def. Mem. at 35 (quoting Durmic, 2010 WL 5141359, at *4).)

We find that William Cave is not typical of the class he seeks to represent.  Again, the Cave II Class is comprised of those who entered into a TPP that Saxon counter-signed and returned, who made all required monthly payments, and who did not receive permanent Home Affordable Modifications by the Modification Effective Date.  To be eligible to receive a permanent modification, a borrower had to satisfy the two conditions precedent contained in the TPP.  (See Cave I May Opinion at *7 (holding that the requirements that the borrower make the trial period payments and provide true and accurate financial information constituted conditions

precedent to Saxon's obligation to provide a permanent modification).)  Accordingly, to be a member of the Class, one has to have been actually eligible to receive a permanent modification.

William Cave's TPP was countersigned by Saxon on October 5, 2009, meaning that Saxon's obligation to make a permanent modification was created, subject to William Cave satisfying the two conditions precedent to Saxon's performance — i.e., making his three trial period payments and "the continued validity of [his] representations regarding [his] financial conditions." Cave I May Opinion at *5.  Importantly, the class certification record demonstrates that the oral financial information that William Cave provided to Saxon to get his TPP was not accurate; thus he never satisfied the condition precedent that his financial information remain true and correct during the trial period.

Plaintiffs seek to avoid this result by pointing out that Saxon's countersigning the TPP established that William Cave and the class members, "did in fact qualify for modifications . . . [and] Saxon committed breach of contract when it failed to provide Plaintiff with a modification or a denial letter by the stated MED."  (Pl. Reply Br. at 37.)  This assertion misstates the Cave II Class definition by conflating it with the Cave I definition.  Cave II is an actual eligibility class — defined as those who did not receive a permanent modification; only Cave I premises membership in the class on untimely denials.   The fact that William Cave failed to satisfy the second condition precedent of being granted a permanent modification makes him atypical of the Cave II Class since he was never actually eligible.  (See Courchane Report ¶ 18.)  Whether Saxon allegedly breached its contractual obligation to issue William Cave a denial letter before

the expiration of his MED is therefore *not* the same claim brought on behalf of the class and is individual to him.[11]

    d.    Adequacy

The fourth requirement in Rule 23(a) is that the representative plaintiffs must "fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). Adequacy concerns both "the experience and performance of class counsel" and "the interests and incentives of the representative plaintiffs." Dewey v. Volkswagen Aktiengesellschaft, 681 F.3d 170, 181 (3d Cir. 2012) (citing In re Cmty. Bank of N. Va., 418 F.3d 277, 303 (3d Cir. 2005). "The principal purpose of the adequacy requirement is to determine whether the named plaintiffs have the ability and the incentive to vigorously represent the claims of the class." Community Bank III, 795 F.3d at 393 (quoting In re Cmty. Bank of N. Va., 622 F.3d 275, 291 (3d Cir. 2010) (Community Bank II)). In fact, "'the linchpin of the adequacy requirement is the alignment of interests and incentives between the representative plaintiffs and the rest of the class.'" Community Bank III, 795 F.3d at 393 (quoting Dewey, 681 F.3d at 183). This inquiry is closely tethered to the typicality inquiry, see Danvers Motor Co., Inc., 543 F.3d at 149, and ensures that the named plaintiff's claims "are not antagonistic to the class." Id. at 150 (citing Beck v. Maximus, Inc., 457 F.3d 291, 296 (3d Cir. 2006)).

Plaintiffs assert that both adequacy prongs are met as the named plaintiffs' interests are aligned with those of class members they seek to represent since they suffered the same economic injuries. They assert that Class Counsel have the experience, skill and qualification necessary to conduct complex class action litigation, have pursued the claims vigorously, and

---

[11] Although we find that Plaintiffs have not satisfied typicality for the Cave II Class, we will discuss the other certification issues for the class so that there is a complete decisional record.

have no actual or potential conflicts with the Classes.  Saxon makes no specific response on the adequacy prong.  Mirroring the typicality analysis, we find that <u>Cave I</u> plaintiffs are adequate, but William Cave is an inadequate representative of the <u>Cave II</u> Class.  Because he was not actually eligible for a permanent modification, William Cave's interests and incentives do not align with the <u>Cave II</u> Class.  There is nothing in the record to question the adequacy of Class Counsel and we find that they have the experience, skill and qualification necessary to conduct the litigation.

## VII.    <u>CAVE II</u> RULE 23(b)(3) ANALYSIS

A class action can be certified under Rule 23(b)(3) where the court finds (1) that the questions of law or fact common to class members predominate over any questions affecting only individual members, and (2) that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy.  Fed. R. Civ. P. 23(b)(3).  The Rule provides that the following matters are pertinent to these findings include: (1) the class members' interests in individually controlling the prosecution or defense of separate actions; (2) the extent and nature of any litigation concerning the controversy already begun by or against class members; (3) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (4) the likely difficulties in managing a class action.  <u>Id.</u>

a.    Predominance

"Considering whether 'questions of law or fact common to class members predominate' begins, of course, with the elements of the underlying cause of action."  <u>Erica P. John Fund, Inc. v. Halliburton Co.</u>, 563 U.S. 804, 809 (2011); <u>see also</u> <u>In re Modafinil Antitrust Litig.</u>, No. 15-3475, 2016 WL 4757793, at *16 (3d Cir. Sept. 13, 2016) (stating that the predominance inquiry "is especially dependent upon the merits of a plaintiff's claim, since the nature of the evidence

that will suffice to resolve a question determines whether the question is common or individual.") (quoting In re Constar Int'l Inc. Sec. Litig., 585 F.3d 774, 780 (3d Cir. 2009) (internal quotation marks omitted in In re Modafinil).) We "must examine each element of a legal claim 'through the prism' of Rule 23(b)(3)." Marcus, 687 F.3d at 600 (citing In re DVI, Inc. Sec. Litig., 639 F.3d 623, 630 (3d Cir. 2011)). To obtain class certification, "[a] plaintiff must demonstrate that the element of the [legal claim] is capable of proof at trial through evidence that is common to the class rather than individual to its members." Marcus, 687 F.3d at 600 (citation omitted). If proof of an element of the legal claim requires individual treatment, then class certification is unsuitable. See Tyson Foods, Inc. v. Bouaphakeo, 136 S. Ct. 1036, 1045 (2016) (stating that "[a]n individual question is one where members of a proposed class will need to present evidence that varies from member to member, while a common question is one where the same evidence will suffice for each member to make a prima facie showing [or] the issue is susceptible to generalized, class-wide proof.") (internal quotation marks omitted) (citing Newberg on Class Actions § 4:50, pp. 169-197); In re Hydrogen Peroxide Antitrust Litig., 552 F.3d at 311-312 (stating that "the task for plaintiffs at class certification is to demonstrate that the element [] is capable of proof at trial through evidence that is common to the class rather than individual to its members. Deciding this issue calls for the district court's rigorous assessment of the available evidence and the method or methods by which plaintiffs propose to use the evidence to prove [the elements] at trial."); see also Fed. R. Civ. P. 23 advisory committee's note to 2003 amendment ("A critical need is to determine how the case will be tried.").

For the Cave II Class, the only legal claim the Class seeks to pursue is breach of the TPP contract. (Pl. Mem. at 36.) In Pennsylvania, the elements of breach of contract are "(1) the

existence of a contract, including its essential terms, (2) a breach of a duty imposed by the

contract[,] and (3) resultant damages." Ware v. Rodale Press, Inc., 322 F.3d 218, 225 (3d Cir.

2003) (alteration in original) (quoting CoreStates Bank, N.A. v. Cutillo, 723 A.2d 1053, 1058

(Pa. Super. Ct. 1999)).  Of course, it must be remembered that the Cave II Class is a multistate

class that includes borrowers who reside in Arizona, Hawaii, Idaho, Illinois, Indiana, Maine,

Massachusetts, Montana, Nevada, Oregon, Pennsylvania, Rhode Island, Washington, and

Wisconsin.  Plaintiffs argue that the differences in the law of contracts among these states are

trivial and should have no effect on the predominance analysis.

Plaintiffs assert that common issues predominate with respect to the breach of contract

claim because

> interpretation of the TPP is a matter of law, the members of the Cave II Class and
> Saxon each executed the same TPP document and the questions pertaining to its
> nature, meaning and effect may be resolved in a single stroke.  The Court has
> already determined that TPP is an enforceable contract.  As such, it contains
> within it all of the obligations necessary to determine breach and performance.  If
> the legal question is resolved in Plaintiffs' favor, there are no individualized
> issues going to performance that remain to be addressed.  The question can be
> resolved with a legal determination that is common to the Cave II Class.

(Pl. Mem. at 36.)  Plaintiffs contend that we do not need to determine on a class-wide basis

whether they satisfied both of the conditions precedent to Saxon's granting them their permanent

modifications.  (Id.)  Instead, they insist,

> the relevant inquiry is:  (1) whether Saxon determined by the MED that the
> borrower's Section 1 representations remained true; and (2) if the borrower's
> Section 1 representations did not remain true, whether Saxon provided the
> borrower written notification of denial by the MED.  Both of these questions can
> be answered with reasonable ease by analyzing Saxon's IR2 data.  As Saxon's
> Rule 30(b)(6) witness has admitted, Saxon did not deny any modifications until
> March 2010, which is more than a month after the latest possible MED for the
> TPPs Saxon entered into between May 2009 and October 2009, inclusive of any
> Treasury extensions.  Thus, with respect to the entire Cave II Class, Saxon failed
> to make a negative determination pursuant to Section 1 of the TPP, and therefore,
> may not invoke this contingency after the MED as a basis to deny a permanent

> HAMP modification.   And, because Saxon failed to offer permanent HAMP
> modification to any member of the Cave II Class, Plaintiffs can establish Saxon's
> breach of the TPPs on a class-wide basis.

(Pl. Mem. at 37.)

To resolve this Rule 23(b)(3) predominance issue, we must first determine what Plaintiffs need to prove at trial to establish their claim, since it is the elements of the underlying legal claim — and not the class definition — which plaintiffs must demonstrate are "capable of proof at trial through evidence that is common to the class rather than individual to its members."  Marcus, 687 F.3d at 600 (citation omitted); see also Fed. R. Civ. P. 23 advisory committee's note to 2003 amendment ("A critical need is to determine how the case will be tried.").  Plaintiffs rely heavily on our prior discussion of their claims at the pleadings stage of the litigation to argue here that they are entitled to relief if they can show that Saxon countersigned their TPPs, they made their three payments, and they did not receive a modification by their modification effective dates. They argue they can meet the predominance element of Rule 23(b)(3) by showing only these elements since these are all of the elements they will need to prove liability.  We cannot accept this reasoning.

We have held that to be "actually eligible" for a permanent modification, each borrower had to satisfy two conditions precedent:  make the trial period payments and provide true and accurate financial information.[12]   See Cave II May Opinion at *7.   Whether a borrower

---

[12]  More specifically, our prior decisions have established as the law of the case that the specific language in the TPP form received by both Cave I and Cave II class members created an enforceable promise.  See Cave I May Opinion, 2012 WL 1957588, at *5; Cave v. Saxon Mortg. Servs., Inc., Civ. A. No. 12-5366, 2013 WL 1915660, at *6 (E.D. Pa. May 9, 2013) ("Cave II May Opinion").  We concluded for the Cave II Class that Saxon was required to make a determination regarding a borrower's qualifications for a modification under HAMP regulations upon receipt of the borrower-signed TPP, and that its return of a countersigned TPP to the borrower was a "communication that the borrower was, in fact, qualified."   Cave II May Opinion, 2013 WL 1915660, at *6.   We held, however, that the TPP contained the two

submitted accurate financial information to Saxon is a condition precedent to receiving a permanent modification under the terms of the TPP and the HAMP regulations and, we find, is an individual issue not capable of proof with evidence that is common to the class.  Plaintiffs have proposed a class definition for the <u>Cave II</u> Class that premises membership on eligibility for a HAMP modification — i.e., "not receiving a permanent modification" — but that fails to incorporate both requirements for receiving a permanent modification.  We find that this makes class treatment of the claim ultimately unworkable since common questions cannot predominate and individual issues concerning whether each member of the proposed class satisfied the eligibility requirements for a permanent modification overwhelms questions that are common to the class.

Whether a borrower submitted accurate financial information and whether that information remained true during the course of the trial plan period requires evaluation of each borrower's verbal representations and their follow-up document submissions.  We find that Dr. Ayres' proposed methodology cannot be uniformly applied to available electronic data to identify such borrowers.  Indeed, he makes no attempt to do so, focusing instead only on the trial period payments requirement.  (<u>See</u> Ayres Report ¶¶ 61-74.)  As Dr. Courchane opines, the Class members' eligibility for a permanent modification cannot be determined reliably without review

---

conditions precedent required to trigger Saxon's obligation to provide a permanent modification even though it returned the countersigned TPP:  (1) making the trial period payments and (2) providing financial documentation to show that the information the borrower provided Saxon was true and correct when given and remained true and correct during the trial period.  <u>Cave II</u> May Opinion, at *7.  Finally, we held that the TPP's MED was the date "by which Saxon was required to issue a denial or provide the permanent modification.  <u>Id.</u> at *4.  We reiterated this decision in the <u>Daubert</u> proceedings, stating that "[i]f a borrower's finances were not as represented, i.e., if he or she did not satisfy a condition precedent, Saxon's obligation was to deny the permanent modification by the MED."  (October Opinion, 2015 WL 6153754, at *8.)

of loan file documentation, documentation regarding the requirements of the HAMP program, and the circumstances and actions of individual borrowers.  (See Courchane Report ¶ 15.)

Saxon's obligation to issue a denial by the MED is also an issue that is individual to each putative class member.  We find that the Class cannot show that Saxon failed to meet its obligation to issue denials by the MED listed in each borrowers' TPP through evidence that is common to the class.  The Class argues that it can meet the predominance test because Saxon's corporate designee testified that until March 2010, Saxon refrained from removing borrowers from the program permanently.  But that is not evidence that Saxon failed to provide notice to those borrowers that they did not qualify.

Saxon has produced sufficient evidence for a jury to conclude that many putative Cave II Class members **did** receive notice prior to the expiration of their trial plan periods that they did not qualify for a permanent modification.  For example, the record shows that Saxon mailed William Cave a letter dated December 31, 2009 notifying him that he had "failed to submit all required documentation" and was therefore "at risk of losing eligibility," but that his trial modification review period was being extended until January 31, 2010 to permit him to come into compliance.  (Lechtzin Decl. Ex. 23 (Saxon's trial period extension letter); Smith Tr. at 156:4-157:21.)  The letter told Cave that if he did not come into compliance, "you will be denied a Final Modification and you will not be eligible to receive a Home Affordable Modification in the future."  (Id.)  Saxon argues that a reasonable jury could conclude that this letter was sufficient notice to discharge its obligation under the TPP.  In addition, while his trial period should have ended — either by way of a denial or a grant of a HAMP modification by February 1, 2010 — Saxon notified Cave on February 5, 2010, that on January 28, 2010, Treasury had announced additional guidance that could affect his modification.  (Def. Ex. 31.)  This letter also

notified him that if he failed to continue making his trial period payments while Saxon assessed his eligibility under the new guidance, he would be denied a permanent modification.  (Id.) Finally, Saxon points to evidence of telephone contacts with William Cave from which a jury could conclude that he was on notice that he was ineligible for a permanent modification.  (See Def. Ex. 32 (Saxon telephone log) recording telephone contacts with William Cave on January 4, 2010, January 6, 2010, January 18, 2010, January 28, 2010, February 2, 2010, February 27, 2010, March 10, 2010.)

Saxon cites this evidence to show that whether any particular member of the putative class was issued a denial prior to the expiration of their trial period plan is an inherently individualized endeavor.  It argues that, even where it did not fully discharge its obligation to issue a denial by the MED , the jury would nonetheless be called upon to determine whether Saxon and each borrower entered into a binding agreement to extend the trial period (and with it, the time for the borrower to satisfy the conditions and the deadline for Saxon's performance). This could have been accomplished in a number of ways, including through a unilateral contract — an offer calling for acceptance by performance.  See, e.g., Fennimore v. Bank of Am., Civ. A. No. 14-6883, 2015 WL 7075814, at * 6 (E.D. Pa. Nov. 12 , 2015).  Saxon points to the evidence of William Cave's extension to support precisely this occurrence since Saxon made the offer to extend and a jury could determine that Cave accepted the offer by way of his continuing to make payments.  See id. at *7 (stating the offeree need only "perform in accordance with the terms of the offer").

Saxon contends that many, if not most borrowers, accepted Saxon's offers to extend their trial periods, because it was to their benefit to do so.  It asserts that, because the likely alternative to extension was permanent denial, Saxon's offer conferred a benefit on borrowers who had

every incentive to agree.  Saxon argues that a jury could reasonably conclude that members of the Class agreed to modify the length of the trial period and the time for each party's performance.  But any such conclusion would necessarily involve evidence that is individual to each class member, destroying any possibility of showing that common issues of law or fact predominate and can be shown by evidence that is common to the class.  We agree.

Each putative class member's interactions with Saxon during the course of their trial period could establish that (1) Saxon verbally notified them that they were ineligible, (2) Saxon warned them of problems with their eligibility, which were either cured or not cured by the borrower, or (3) Saxon and the borrower altered the terms of the trial plan in the course of those interactions.  One key consideration supporting Saxon's position is that the **form** of notice Saxon was required to give a borrower by the end of their trial plan that they failed to qualify is not specified in the TPP.  Accordingly, we find that Saxon is correct that a verbal notice of denial or a verbal offer to extend the trial period were possible ways to meet its obligation — and the legal efficacy of such notice is an individual inquiry that is not capable of proof by evidence common to the class.[13]

---

[13] Plaintiffs urge that Saxon's arguments about verbal extensions to the MED must be rejected on statute of frauds grounds because in Pennsylvania the statute of frauds requires any contract modifying a mortgage to be in writing.  (See Pls. Resp. to Supp. Opp. at 23 (citing U.S. Bank Nat. Ass'n v. JGKM Assoc. LLC, Civ. A. No. 12-4550, 2015 WL 1474448, at *5 (E.D. Pa. Mar. 31, 2015).  They argue that there can be no valid verbal modification to the MED since the TPP itself is a written modification to the borrower's original mortgage.  While Plaintiffs are correct that mortgages and modifications of mortgages "are **generally** subject to the statute of frauds," see Phoenix Four Grantor Trust # 1 v. 642 N. Broad St. Assocs., Civ. A. 00-597, 2000 WL 876728, *5 (E.D. Pa. June 29, 2000) (emphasis added), an "agreement generally subject to the statute of frauds may be taken out of its purview if: (1) "there is evidence to establish that the agreement was made" . . .; (2) the modification is admitted by the party against whom enforcement is sought . . . ; or, (3) there has been performance or part performance."  Bayer v. CitiMortgage, Inc., Civ. A. No. 11-2105, 2014 WL 4187556, at *4 (M.D. Pa. Aug. 22, 2014) (internal citations omitted).)  Evidence demonstrating that an agreement was made must be clear and competent, and "it may be proven by the acts and declarations of the parties, either together

Accordingly, we find that the <u>Cave II</u> Class has failed to meet its burden to show by evidence common to the class that common issues predominate.  Because we find that there are no predominant liability issues, we do not reach the question of whether the Class has shown that common questions concerning damages to the <u>Cave II</u> Class predominate over individual questions.

      b.      Superiority

The superiority requirement "asks the court to balance, in terms of fairness and efficiency, the merits of a class action against those of alternative available methods of adjudication.'"  <u>In re Processed Egg Prods. Antitrust Litig.</u>, 284 F.R.D. 249, 264 (E.D. Pa. 2012) (quoting <u>In re Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions</u>, 148 F.3d 283, 316 (3d Cir. 1998.  We use the four factors listed in Rule 23(b)(3) — (1) the class members' interests in individually controlling the prosecution or defense of separate actions; (2) the extent and nature of any litigation concerning the controversy already begun by or against class members; (3) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (4) the likely difficulties in managing a class action — to make the determination.

Addressing individuality, Plaintiffs argue that there are a potentially large number of class members – numbering at least 1,329 and 37 for the Cave II and Cave I Classes, respectively – who are geographically widely disbursed, lack financial resources, and have no realistic ability to litigate their claim individually.  Plaintiffs add that if the putative class members' claims were prosecuted individually it would severely strain judicial resources.  On the second factor,

---

or separately." <u>Id.</u> (quoting <u>Kurland v. Stolker</u>, 533 A.2d 1370, 1373 (Pa. 1987)).  Whether "there has been performance or part performance" by each class member — continuing to make trial period payments after the MED in reliance upon a verbal extension of the trial period — is an arguably applicable exception to the general rule, and is itself an individual issue not capable of proof by evidence that is common to the class.

Plaintiffs assert that they are not aware of any parallel class action litigation in any of the <u>Cave II</u> Class members' fourteen states of citizenship.  Plaintiffs assert that this factor weighs in favor of the superiority of a class action.  On the concentration factor, Plaintiffs argue that there is no evidence showing that a different forum has a greater interest in this action.  Furthermore, resolving the claims of the <u>Cave I</u> and <u>Cave II</u> Classes in a single proceeding will facilitate uniform rulings and consistent results.  Finally, on manageability, Plaintiffs argue that the available data from Saxon's submissions permits class-wide examination of liability and damages issues and that this matter presents no manageability issues.  Saxon responds that a class action is not superior to individual litigation because of the numerous individual factual inquiries already discussed.

Given all of the problems already discussed with regard to the class definitions, the named Plaintiffs, and whether common issues predominate, we find that Plaintiffs have not shown that a class action is a superior method to adjudicate these claims.  The nature of the litigation, specifically the reasonable timeliness of Saxon's notice in <u>Cave I</u> and the dependence of <u>Cave II</u> class members' claims on their eligibility for a HAMP modification, preponderates against a finding that a class action is a superior vehicle for resolution of the claims.

## VIII.   CONCLUSION

Plaintiffs' attempts to certify the <u>Cave I</u> and <u>Cave II</u> classes ultimately fail.  The <u>Cave I</u> Class is not cohesive, William Cave is not typical of the class he seeks to represent, and common issues of law and fact do not predominate in the <u>Cave II</u> Class as required by Rule 23(b)(3).  Accordingly, the Motions for certification are denied.

An appropriate Order will be entered.

BY THE COURT:

47

/s/ John R. Padova
JOHN R. PADOVA, J.